James R. THOMPSON and Beverly Thompson, Appellants,

v.

The TRANE COMPANY and Standard Refrigeration & Engineering, Appellees.

No. 43573.

Supreme Court of Oklahoma.

April 11, 1972.

Rehearing Denied Sept. 26, 1972.

Robert S. Baker, Oklahoma City (Pierce, Duncan, Couch & Hendrickson, Oklahoma City, of counsel), for appellants.

Watts, Looney, Nichols & Johnson, Oklahoma City, for appellee, The Trane Co.

Ben A. Goff, Oklahoma City, for appellee, Standard Refrigeration & Engineering.

LAVENDER, Justice.

The case involves a claim that a home gas-fired furnace manufactured by the appellee The Trane Company and sold to the plaintiffs by the appellee Standard Refrigeration & Engineering Company was defective in that it leaked gas. It was further alleged that the gas leak somehow ignited and melted a control valve inside the furnace with the result that the fuel supply

became uncontrolled and caused a damaging fire to plaintiffs' new home. Another defendant—a sub-contractor of Standard (Climate Air Conditioning, Inc.)—was also joined. The primary question here involves the sufficiency of the evidence. Plaintiffs in the trial court, who are the appellants here, urge the trial court erred when it sustained the defendants' demurrers and motions for directed verdicts.

The parties, for convenience, will be referred to by name or by their respective trial court designation.

The pertinent facts gleaned from the record are these:

Plaintiffs, Mr. and Mrs. Thompson, as the owners and builders of a rather large home in Oklahoma City, entered into a contract in writing with Standard whereby the latter sold to the Thompsons the furnace involved. The contract appears in the record as an exhibit. According to that instrument, Standard sold three of the units identical to the one involved in the fire to the plaintiffs. These units were to be installed by Standard in three different locations in plaintiffs' home. The carpentry work necessary to accommodate the units, as well as the electrical wiring and the installation of all necessary gas piping, was done under plaintiffs' direction by persons other than the defendants in this cause.

Standard's contract was to "furnish, install and service" heating units as well as air conditioning equipment. The contract contained this clause: "After installation, our qualified representative will start, test, and provide instructions on the care of the equipment."

The particular gas furnace involved was manufactured by Trane and sold to Standard in July 1966. According to undisputed evidence, the furnace was subjected to tests at the factory which would have revealed any leaks in the unit. After the testing procedure, the unit was packaged in a carton for shipment to Standard. The carton was so constructed that it did not allow access to the unit except by opening the carton.

Standard sub-contracted part of the work to Climate. As a part of their work, that company picked up the furnace unit still in its undisturbed carton as shipped from Trane and delivered it to the job-site where it was uncrated and installed in a 'small closet-type opening in one of the interior hallways of the plaintiffs' home. Climate, in addition to this work, also installed certain ducts in the ceilings of the home. As we have already noted, the actual hooking-up of the unit to the electrical and gas connections was to be done by other people employed by plaintiffs.

Thereafter, in October 1966, Mr. Thompson called a Mr. Tassell (Standard's employee) apparently to request that the furnaces be turned on because by that time it was getting cold and the workmen in the house would be more comfortable if it was heated. At that time, the gas company had not yet installed its meter at the home. Mr. Thompson testified that thereafter he was advised by the gas company that the meter would be installed on November 4. Plaintiff said he called Tassell back and told him what the gas company had said and Tassell told plaintiff, "Well, we will get you some heat."

The plaintiff did not testify that all of the electrical and gas piping had at that time been completed or that, as far as he was concerned, the installation of the furnace had been "completed," in the sense that that term is used in the contract. According to Standard's contract, they were to be paid "30% at Ground Work; 30% at Rough In and 40% at completion." The last payment had not been made and in fact was not made at the time the fire occurred some six weeks after the November 4th date.

The plaintiff further testified that in one of these two conversations with Tassell the latter suggested that "he put up temporary thermostats so that the painters wouldn't damage the new ones." These "temporary" thermostats were delivered to the job

by Standard. The plaintiff testified that after the second conversation with Tassell he had no further direct communication with him until after the fire which occurred on December 18, 1966. However, the plaintiff also testified that sometime after November 4th he observed temporary thermostats on the walls and that the furnace was in operation. The unit appeared, to Thompson, to be operating satisfactorily with the exception that approximately two weeks before the fire occurred plaintiff noticed the vent pipe from the furnace had become blackened with smoke. He called Standard and reported this fact to the telephone girl. Tassell was not in at the time.

The plaintiff did not know who lighted the furnace. Standard's Mr. Tassell testified that neither he nor any of Standard's people started or tested the unit. This witness stated that on two or three occasions he tried to telephone Mr. Thompson to see if the unit was ready to be started, but that he was unable to get in touch with the plaintiff before the December 18th fire.

The fire occurred on a Sunday afternoon. The house had been closed up and unoccupied by workmen since noon of the day before. At five or six o'clock on the day before the fire, Mr. Thompson came by the house and went through it checking on the progress of the work and making sure that the house was locked up. Everything seemed to be in order. The following afternoon he received word that the house was afire.

According to the testimony of the fire marshal, who investigated the fire to determine its cause, the fire originated from a gas leak in or in close proximity to a regulator or control valve inside the unit. The leak ignited and somehow the control valve, or a portion of it, melted. When it had sufficiently melted so that the gas supply pipe was no longer connected in the enclosed piping system of the furnace, the raw gas coming from the supply pipe ignited and created a "blow-torch" effect which in turn caused the fire damages to the house.

The "defect" in the furnace unit upon which plaintiffs depend to establish their cause for damage against both Trane and Standard was the gas leak described by the fire marshal's testimony. What caused this leak was not testified to by any witness. We are asked to infer that under all of the circumstances the leak must have been in the unit when it was transferred from Trane's possession to Standard. There was no evidence adduced that the manner of the unit's installation, which actually was done by Climate, was such that it caused the gas leak to develop. There was testimony from which the plaintiffs argue it could be inferred that the leak was either inside the regulator control valve or at least on the side of the valve opposite from the side into which the plaintiffs' plumber attached the gas supply pipe. On the connection to which the supply pipe was connected, there was a tag attached by the manufacturer, a copy of which was admitted as an exhibit. That tag contains the words: "Caution tighten pipe only to obtain a good seal. Excessive torque can cause damage."

We have confined our discussion of the evidence to that which is most favorable to the plaintiffs in view of the action of the trial court, the effect of which was that such evidence was insufficient to submit plaintiffs' claim to the jury. The trial court, in announcing its decision, stated that the evidence of fault on defendants' part was "too speculative" to submit the case and further that it seemed to the court "that the plaintiffs had not negatived effectively other—the fault of others in connection with the fire—." The court's comments, at least in part, provoked the following "propositions" of error for which plaintiffs now seek to reverse the trial court:

"Proposition I—The trial court erred in ruling as a matter of law that the plaintiff in a products liability case must 'negative the fault of others' to prevail against the manufacturer, installer and seller of a defective product.

A. In passing on a motion for a directed verdict the trial court must disregard all evidence favorable to the movant and consider as true all evidence in favor of the party opposing the movant.

B. To withstand motion for directed verdict all that is required of plaintiff is to present evidence that it is more probable than not that plaintiff's injury resulted in whole or in part from defendant's conduct, and this fact may be established by circumstantial evidence.

C. It is reversible error to sustain defendant's motion for directed verdict where there is any evidence reasonably tending to support the claim of the plaintiff.

"Proposition II—A manufacturer and seller of a product is strictly liable in tort if a defective product causes the purchaser damages.

"Proposition III—A manufacturer and seller of a product, dangerous if defective, owes a duty to use reasonable care to see that it is safe for its intended use.

"Proposition IV—A manufacturer and seller of a product impliedly warrant to the purchaser that the product is safe to be used for its intended purpose.

"Proposition V—The trial court erred in failing to sustain plaintiff's motion for directed verdict."

■ We are of the view that what the trial court intended (by his remark quoted above) was that considering all of the evidence in a light most favorable to plaintiffs all reasonable men would agree that the probability the fire resulted from a defect introduced into the furnace by the manufacturer and (either in breach of its contract or as result of negligence) overlooked by Standard was no greater than the probability that the gas leak was caused by some means outside and beyond the area of the defendants' responsibilities.

After reviewing the evidence, we are inclined to agree with the trial court.

The facts of the case distinguish it from Marathon Battery Company v. Kilpatrick (1965), Okl., 418 P.2d 900, upon which plaintiffs principally rely. The cited case involved a common electric dry cell battery which, according to the evidence, gave absolutely no indication that it was defective and neither could such defects—as obviously existed—have been discovered by the most careful examination. The battery exploded when being used by the plaintiff for the purpose for which it was intended. There was a strong inference in that case that the battery was in exactly the same condition when it caused the harm to the consumer that it was in when it was transferred from the possession of the manufacturer. No such inference exists in the case presently before the court.

In this case there was no competent evidence introduced from which it could be reasonably inferred that the furnace was defective when it was transferred from the manufacturer to the retailer or even when it was installed by the latter in the plaintiff's home. Even if we assume the evidence was sufficient to demonstrate that the fire was caused by a leak in the furnace, the evidence did not disclose *when* the leak occurred or as to the *cause* of it. The testimony of the fire marshal to the effect that a furnace may leak gas for a long period (here six weeks elapsed between the first use of the furnace and the occasion of the fire) before it may be ignited does not establish that this particular gas leak pre-existed the December 18th fire by any specific period of time much less the six weeks period which the jury would have to say it existed in order to hold the manufacturer and the seller liable.

■ We conclude therefore that plaintiffs' Proposition I subparagraphs A, B, and C are without substance under the circumstances herein. Propositions II, III, and IV find their complete answer adverse to plaintiffs in Marathon Battery and the

other cases referred to therein from other jurisdictions which require as a condition to the imposition of liability for a defective product that it was defective when it was transferred from the manufacturer's possession. Paragraph 5 of the Syllabus by the Court, Marathon Battery Company v. Kilpatrick, supra.

■ Although the point is not formally raised by the brief of plaintiffs that Standard violated its contract in that it must have failed to adequately test the furnace before it was turned on, we are of the view that such a conclusion would not be warranted under the circumstances. There was no proof that the installation of the furnace had been completed on November 4th (or any date prior to the fire), and that Standard was therefore requested to start and test the furnace. We cannot "assume" with plaintiff that Standard tested the furnace or even that the latter should have tested the furnace on or after November 4th in view of the language of the contract that such obligation to start and test the furnace would arise after the installation of the unit was complete. If it was complete on that date, it was the plaintiffs' obligation to so inform Standard. The plaintiff, Mr. Thompson, was in charge of the job and in a position akin to that of a general contractor.

■ What has been said with regard to the reasons plaintiffs cannot prevail as against the manufacturer Trane and the seller Standard apply with equal force to exclude the "installer" Climate of liability to plaintiffs and the trial court did not err in sustaining Climate's demurrer at the close of plaintiffs' evidence.

There being no error, the judgment is affirmed.

BERRY, C. J., and JACKSON, IRWIN and BARNES, JJ., concur.

WILLIAMS, HODGES, McINERNEY and BACON, JJ., dissent.

DAVISON, V. C. J., certified his disqualification and KENNETH BACON, J.. was appointed to serve in his place.