Leonard WOODS and Kathleen Woods, husband and wife, Appellants/Cross–Appellees,

v.

FRUEHAUF TRAILER CORPORATION, A Michigan Corporation, and Pier 51 Incorporated, an Oklahoma Corporation, Appellees/Cross–Appellants.

No. 64857.

Supreme Court of Oklahoma.

Oct. 4, 1988.

As Modified on Denial of Rehearing Jan. 9, 1989.*

---

\* OPALA, V.C.J., LAVENDER, ALMA WILSON and SUMMERS, JJ., and BACON, Special Justice, concur in denial of rehearing.

DOOLIN, J., and HANSEN, Special Justice, concur in denying Pier 51's rehearing petition and dissent from denying rehearing petition by Woods.

HARGRAVE, C.J., and SIMMS, J., dissent to denial of rehearing.

McKinney, Stringer & Webster P.C. by Kenneth R. Webster and George D. Davis, Oklahoma City, for appellants/cross-appellees Woods.

Monnet, Hayes, Bullis, Thompson & Edwards by John T. Edwards and Henry J. Hood, Oklahoma City, for appellee/cross-appellant Fruehauf Trailer Corp.

Fenton, Fenton, Smith, Reneau & Moon by Donald R. Wilson and Laurie W. Jones, Oklahoma City, for appellee/cross-appellant Pier 51, Inc.

LAVENDER, Justice:

Appellant Leonard Woods was employed by a transport company which delivered gasoline from refineries to retailers. Woods owned his own truck but was supplied with the tanker trailer by his employer. On the date in question in this case Woods was supplied with a tanker trailer which had been manufactured by appellee Fruehauf Trailer Corporation. This tanker

trailer had been built specifically for the purpose of transporting materials such as gasoline. Woods' employer had added piping, valves and hoses so that the tanker trailer could be unloaded by gravity into underground storage tanks or could be unloaded by use of a pump into storage facilities above ground. Woods had a pump located on his truck for use in pumping the gasoline into above ground facilities.

On the date in question Woods was ordered to pick up a load of gasoline at a refinery for delivery to appellee Pier 51, Inc. Woods received a load of 8,504 gallons of gasoline at the refinery and hauled the load to Pier 51's facility on Lake Keystone near Tulsa. The gasoline storage facilities belonging to Pier 51 were above ground. The facilities consisted of three tanks, two with a capacity of four thousand gallons and one with a three thousand gallon capacity. All three tanks were interconnected at ground level by a one inch line equipped with gate valves so that the small tank could be used as a reserve and gasoline could be transferred from it to the others as their levels were pumped down. The tanks were cylindrical and placed on their sides with an upspout for loading located at the top and near the front of the tanks. The only method provided for reaching the loading ports was a fifty-five gallon barrel. The tanks were set on a bed of gravel.

When Woods arrived at the Pier 51 facilities he drove his truck and tanker rig to the tanks and positioned the equipment to unload the gasoline via the truck mounted pump into the tanks. Woods was told, however, that the man with the keys to unlock the caps on the tank upspouts was not yet at work. Woods waited for this individual to arrive. During this period of time Woods requested gauge charts for the tanks. These charts gave gallonage figures for incremental levels of gasoline in the tanks. Woods was told that these charts were in the possession of the bookkeeper and no further effort was made to provide these charts to him. When the keys to the locks on the tanks were provided to him Woods proceeded to unload the gasoline into the tanks. Since the tanks were not equipped with any method to determine level except by manually placing a stick down into the tank and measuring in inches, Woods placed the discharge hose fitted with an aluminum down spout into the upspout of a tank and proceeded to pump gasoline into the tank until he could see gasoline begin to come out of the top of the upspout. At that point Woods would cut the engine on his truck which in turn cut the power take-off driven pump. Woods would then close the valve on his truck, and using the fifty-five gallon barrel would climb up to remove the hose and transfer it to the next tank. By this method Woods filled both large tanks and had proceeded to fill the small tank. The small tank filled up faster than expected and more gasoline overflowed. Woods cut the engine and proceeded to remove the hose from the small tank. As he was doing so gasoline on the ground underneath him ignited and Woods was severely burned in the ensuing fire.

Woods and his wife brought the present action against Fruehauf Trailer Corporation on a products liability theory alleging that the tanker trailer was unsafe for the purpose of hauling and unloading gasoline into above ground facilities. The action against Pier 51, Inc., was brought under negligence theory on the allegation that Pier 51 was negligent in failing to provide Woods with a way to measure the tank levels and in failing to inform him of problems such as the tank interconnections and in failing to provide reasonably safe facilities. Woods also sought recovery against the manufacturer of the pump which he used to transfer the gasoline.

The matter was tried to a jury. Following the conclusion of Woods' case, demurrers from all defendants were sustained as against the claims brought by Woods' wife. A demurrer to the evidence was sustained as to the manufacturer of the pump and the manufacturer was dismissed. A demurrer to the evidence to support a claim for punitive damages was also sustained as to appellee Fruehauf. The remaining demurrers by appellees Fruehauf and Pier 51 were overruled. At the conclusion of the

trial the court denied motions for directed verdict by both appellees. The jury subsequently returned a verdict for Woods against Fruehauf and awarded him six million dollars in damages. The jury also found Pier 51 liable but calculated that Woods' contributory negligence in the matter was thirty percent. The jury found Woods' damages as against Pier 51 to be six million dollars and further awarded four hundred thousand dollars in punitive damages. Appellees subsequently moved for mistrial, for judgment N.O.V., for remittitur and for new trial. The trial court took these motions under advisement.

The trial court subsequently denied the motions for mistrial, for judgment N.O.V. and for remittitur. The motions for new trial were granted as to both Fruehauf and Pier 51 on the basis that the court had incorrectly instructed the jury concerning failure to warn as a basis for Fruehauf's liability under products liability theory and because the court felt that the jury had failed to understand its instructions and had rushed to verdict. These latter reasons were in turn based on written questions presented by the jury and on one observation made by the bailiff.

Appellant Woods has appealed arguing that the trial court's grants of new trial were erroneous. Appellees Fruehauf and Pier 51 have filed cross-appeals challenging the trial court's denial of motions for directed verdict and for judgment N.O.V.[1] We shall first deal with the cross-appeals.

### I.

■ It is well established that a motion for directed verdict or motion for judgment N.O.V. raises the question of whether there is any evidence to support a judgment for the party against whom the motion is made.[2] In ruling on such a motion the trial court must consider as true all the evidence and all the inferences reasonably drawn therefrom favorable to the party against whom the motion is made and any conflicting evidence favorable to the movant must be disregarded.[3]

### A.

Fruehauf argues that the evidence presented at trial will not support a judgment under products liability theory because, as a matter of law, the evidence failed to establish that Fruehauf should have equipped the tanker trailer with safety devices or that Fruehauf had a duty to warn potential users of dangers resulting from failure to use such devices. The first argument is based on the proposition that the tanker trailer is not a finished product and that the duty to attach safety devices would attach at a later point in assembly of the tanker unit. The second argument is premised on the assertion that there is no duty to warn of an obvious danger and that gasoline constitutes such a danger.

The elements required to establish a right to recovery under products liability theory were set forth by this Court in *Kirkland v. General Motors Corporation:*[4]

First of all Plaintiff must prove that the product was the cause of the injury; the mere possibility that it might have caused the injury is not enough.

Secondly, Plaintiff must prove that the defect existed in the product, if the action is against the manufacturer, at the time the product left the manufacturer's possession and control. *Thompson v. Trane Co.,* Okl., 500 P.2d 1329 (1972). If the action is against the retailer or supplier of the article, then the Plaintiff must prove that the article was defective at the time of sale for public use or

1. Appellees have also alleged error in the trial court's failure to sustain their demurrers to the evidence presented in Woods' case in chief. Any error on this point was waived when both appellees subsequently presented evidence in support of their defenses. *Messler v. Simmons Gun Specialties, Inc.,* 687 P.2d 121, 130 (Okla. 1984).

2. *Moses v. Haney,* 725 P.2d 866 (Okla.1986); *Gowins v. Merrell,* 541 P.2d 857 (Okla.1975); *Sadler v. T.J. Hughes Lumber Co., Inc.,* 537 P.2d 454 (Okla.App.1975).

3. *Messler v. Simmons Gun Specialties, Inc.,* supra, note 1; *Moses v. Haney,* supra, note 2.

4. 521 P.2d 1353, 1363 (Okla.1974).

consumption or at the time it left the retailer's possession and control.

Thirdly, Plaintiff must prove that the defect made the article unreasonably dangerous to him or to his property as the term "unreasonably dangerous" is above defined.

The definition of "unreasonably dangerous" adopted by this Court was taken from comment g to the Restatement of Torts 2d § 402A, and defines "unreasonably dangerous" as requiring that:

"The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics."

Fruehauf here argues that the "ordinary consumer who purchases" a tanker trailer does not include the general public but should be read in this case to refer to those who would purchase such a product in the ordinary course of affairs. Fruehauf's argument is that an "ordinary consumer" of a tanker trailer is one who would be in the business of hauling the materials which the tanker trailer is designed to carry.

■ The distinction to be made regarding who constitutes an ordinary consumer of a specific product is of important consequence. In the case of *Lamke v. Futorian Corporation* [5] this Court stated:

Only when a defect in the product renders it less safe than expected by the ordinary consumer will the manufacturer be held responsible.

This is particularly true in cases such as the instant case where the "defect" alleged is the failure to minimize an obvious danger which is inherent in the product itself. . . .

Thus if the ordinary consumer of a tanker trailer is one who is familiar with the hazards associated with loading, transporting and unloading gasoline, an alleged "defect" may not render the product less safe than

expected where the same "defect" may render the product unsafe as to the general public. On this point we must agree with Fruehauf that the proper definition of "ordinary consumer" in a products liability action is one who would be foreseeably expected to purchase the product involved. We find this definition to be in line with the pronouncements which declare that a manufacturer must anticipate the foreseeable uses of his product.[6]

In the present case Woods presented expert testimony to the effect that the tanker trailer here involved could not be safely unloaded unless it was equipped with an automatic shutoff nozzle similar to the type employed in ordinary use for filling gasoline tanks on automobiles. The evidence also showed that nozzles existed which could be modified for use at the high flow rates necessary for handling gasoline in large volumes. From this evidence Woods claims a duty has been established to require Fruehauf to either equip its tankers with such nozzles or to warn potential consumers of the dangers of failure to use such nozzles in unloading the tanker.

■ However, as indicated in *Lamke v. Futorian* [7] the proper question here is whether the evidence established that the failure to so equip or to warn regarding use of the tanker rendered it less safe than expected by one who would foreseeably be using the tanker for a foreseeable purpose. Here we find that the evidence presented in the case fails to support the judgment for Woods under products liability theory. There is no question but that Woods was a foreseeable user and that his use of the tanker was a foreseeable use. Woods was an experienced truck driver who at the time of the accident had been hauling gasoline for two years and had been trained in using the tanker trailer by a more experienced driver. Woods testified that with a conversion chart he could tell how much gasoline a receptacle tank would hold. The evidence showed that the tanker was divid-

5. 709 P.2d 684, 686 (Okla.1985).

6. *Smith v. U.S. Gypsum Co.*, 612 P.2d 251 (Okla. 1980); *Fields v. Volkswagen of America, Inc.*, 555 P.2d 48 (Okla.1976).

7. Supra, note 5.

ed into five compartments of varying gallonage and that the pump operated at a specific flow rate. From this evidence one inescapable conclusion can be drawn: that if the empty volume of the receptacle tank was determined prior to the start of unloading it could be filled without overflow by either matching the gallonage to a compartment volume, or by running the pump for a predetermined time at a known flow rate. There is no evidence to contradict the feasibility of this procedure.

The conclusion to be drawn is that the tanker could be operated safely *as equipped* when put into the flow of commerce. The safety equipment and warnings contemplated by the testimony presented by Woods would thus appear to come within the area spoken of in *Futorian* as an attempt to minimize an obvious danger, i.e. spillage of highly flammable liquid, inherent in the use of the product for the purpose of transporting such a liquid. In this case the evidence that the tank could have been made "safer" does not establish that it was less safe than would be expected by the ordinary consumer.

Where, as here, the plaintiff fails to present evidence to prove the necessary elements of an action a motion for directed verdict should have been sustained.[8] The trial court's ruling denying appellee Fruehauf's motion for directed verdict is REVERSED.

### B.

█ In order to support an actionable claim under negligence theory it is necessary for a plaintiff to establish the concurrent existence of: 1) a duty on the part of the defendant to protect the plaintiff from injury; 2) the failure of the defendant to perform that duty; and 3) injury to the plaintiff resulting from such failure.[9] Appellee Pier 51, Inc., here argues, in support of its proposition that a directed judgment or judgment N.O.V. should have been en-

tered in its favor, that Woods' evidence failed to establish that Pier 51 breached any duty owed to Woods. The argument here is premised on the assertion that the dangers associated with the premises were open and obvious and that there is no duty to protect a business invitee from such dangers. While the legal premise here is correct,[10] the application to the facts is not appropriate.

█ In the present case Woods' evidence clearly established that the lines connecting the storage tanks together at ground level were not obvious. Further, from Woods' testimony that the third tank overflowed at a much earlier time than he had anticipated, it is possible to infer that in filling the two larger tanks gasoline had been fed down to the third tank. It is further permissible to infer that the overflow of gasoline from the third tank provided the major source for the fire which injured Woods.

Regardless of the evidence establishing Pier 51's failure to supply Woods with tank charts and its failure to supply a safe method for access to the tanks, the evidence regarding the failure to warn Woods of the tank interconnections or to insure that those interconnections were closed before Woods began filling those tanks is sufficient to support the jury verdict for Woods in negligence theory.

### II.

We next turn to the question raised by appellant Woods as to whether the trial court properly granted the motion for new trial as to Pier 51, Inc.[11] On this point Woods states that the trial court erred as a matter of law in granting the new trial. We agree.

The trial court gave two reasons for granting the new trial. The first was that it had erroneously instructed the jury regarding the duty to warn as to the prod-

---

8. *Davis v. City of Henryetta*, 402 P.2d 902 (Okla. 1965).

9. *Nicholson v. Tacker*, 512 P.2d 156 (Okla.1973).

10. *Nicholson v. Tacker*, 512 P.2d at 158, 159.

11. Because of our finding that Fruehauf should have been granted a directed verdict we need not consider the new trial issue as to Fruehauf.

ucts liability action against appellee Fruehauf. This clearly would not have prejudiced Pier 51 and Pier 51 on appeal does not so argue. The second reason, and the one relied on by Pier 51 in support of the ruling, was that the jury had obviously been confused and acted improperly in rendering its verdict.

■ The trial court's conclusion about the jury's conduct is based on three written questions sent from the jury to the court which requested additional information. In each case the trial court informed the jury to look to their instructions. A fourth question was conveyed orally by the bailiff. As to this question the jury was again instructed to look to their instructions. At this point the bailiff also informed the court that one of the jurors who was pregnant was not feeling well. The bailiff also informed the court however that the jury had already reached a verdict but weren't sure how to express it. The jury, following a correction in one of the verdict forms, returned its verdicts in proper form.

This Court stated, in the case of *Whitehead v. City of Tulsa*,[12] that it would have been error for the trial court to grant a new trial based on speculations concerning the jury's thought processes based on a note. In this case the trial court did erroneously speculate about the jury's state of mind based on its questions and on one ambiguous statement by the bailiff about one juror's condition.

### III.

■ Pier 51 also argues that it was error for the trial court not to grant its motion for mistrial based on the jury misconduct supposedly evidenced by the jury's notes and the bailiff's observation concerning the one juror. Here again the supposed grounds for the mistrial amount to no more than speculation about the jury's thought processes. It is simply improper to allow

an attack on the method by which a jury verdict is reached unless based on evidence that extraneous and prejudicial material had been presented to the jury.[13]

### IV.

■ Finally, and apparently in an effort to support the trial court's grant of new trial, Pier 51 argues that it was improperly prevented from introducing certain evidence. Pier 51 bases this argument on two evidentiary rulings. The first involved testimony by the owner of Pier 51, Inc., at the time of the trial. The owner was allowed to testify that there had never been a request by anyone during the six years he owned the facilities to make any changes in the facilities. However the trial court sustained objections to the specific question of whether the Corps of Engineers inspected the facility. Pier 51 now argues that this evidence would have shown that the facilities met government standards. We find this argument to be without merit. Nothing in the record or on appeal indicates that the Corps of Engineers in any way was responsible for setting safety standards for Pier 51's gasoline storage facilities. In regard to Pier 51's argument that this evidence would have shown that any dangers were open and obvious we can only conclude that this would have been cumulative to the testimony which was allowed that there had been no requests to change the premises in the preceding six years. In the absence of any showing of prejudice from the exclusion of evidence we cannot conclude that a new trial would be appropriate.[14]

■ The second evidentiary ruling involved video deposition testimony of an accident reconstruction expert witness presented by Pier 51. Here the trial court did not allow admission of the expert's testimony as to his opinion that Woods had

---

12. 614 P.2d 65, 68 (Okla.1980).

13. *Willoughby v. City of Oklahoma City,* 706 P.2d 883 (Okla.1985); *Holden v. Coussens,* 576 P.2d 758 (Okla.1978).

14. 12 O.S.1981 § 2104(A)(2) requires that an offer of proof be made before error can be predicated on a ruling excluding evidence. That was not done here and the reason for the requirement is apparent in this case from the failure of the record to demonstrate how Pier 51 was prejudiced by the exclusion.

caused the accident because at the point the objection was raised the expert had not testified to sufficient facts on which to base such an opinion. The trial court stated that it would make a subsequent ruling after additional testimony to establish a basis for the opinion. Pier 51 however failed to request the ruling after the additional testimony. In the case of *Gabus v. Harvey*,[15] this Court stated in regard to admissability of expert testimony under the Oklahoma Evidence Code:[16]

> The test under § 2702 is usefulness. Will the expert testimony assist the trier of fact? If not helpful, then expert conclusions or opinions are inadmissible. [See, Frank T. Read, Oklahoma Evidence Handbook, p. 184, § 2702 (1979); 3 J. Weinstein & M. Berger, Evidence, § 704–2 (1981); McCormick, Evidence, § 12 (2d ed. 1972).]

> Section 2403 gives the trial judge the additional discretion to exclude statements of opinion that otherwise meet the § 2702 requirement, but their probative value is substantially outweighed by the risk of prejudice, confusion, or waste of time.

At the time the trial court made its ruling it would have been properly excluded under the 12 O.S.1981 § 2702 standard of usefulness because of lack of foundation or under the 12 O.S.1981 § 2403 standard of risk of prejudice outweighing probative value for the same reason.

## V.

As previously stated, the trial court's ruling denying Fruehauf's motions for directed verdict and judgment N.O.V. is REVERSED. The trial court's ruling denying Pier 51's motions for directed verdict, judgment N.O.V. and for mistrial is AFFIRMED. The trial court's ruling granting a new trial as to Fruehauf and Pier 51 is REVERSED. The cause is remanded for entry of judgment on the jury verdict against Pier 51. Because this court has found the trial court to have erroneously vacated, as to Pier 51, the judgment on the

jury's verdict for the plaintiff by granting a new trial, the effective date of the judgment, for purposes of postjudgment interest, shall be the date judgment was initially rendered on the jury verdict.

OPALA, ALMA WILSON and SUMMERS, JJ., and BACON, Special Justice, concur.

HARGRAVE, V.C.J., concurs in Part A; dissents in Part B.

HANSEN, Special Justice, concurs in Part B; dissents in Part A.

SIMMS, Justice, dissenting.

I would affirm the action of this trial court in granting each defendant's motion for new trial.

HODGES, J., disqualified.

KAUGER, J., recused.