**Beatriz B. MYERS, Betsy K. Myers, and Grace Myers, Appellants,**

v.

**Eva Marissa MAXEY, John R. Preston, and Kornfeld Franklin, Inc., n/k/a Northwest Legal Services, Inc., Appellees.**

**No. 84380.**

Court of Appeals of Oklahoma, Division No. 1.

Dec. 5, 1995.

Certiorari Denied April 3, 1996.

As Corrected April 19, 1996.

Jennifer E. Irish, Oklahoma City, for Appellants.

John B. Hayes, Oklahoma City, for Appellees.

### MEMORANDUM OPINION

CARL B. JONES, Presiding Judge:

Appellants, the widow, daughter and stepdaughter of deceased, sued attorneys and their law firm for legal malpractice, alleging the attorneys failed to have a will made by deceased (who had been placed under guardianship) subscribed and acknowledged before a district judge as required by 84 O.S.1991 § 41(B). The trial court granted a motion for a directed verdict by one of the attorneys, and entered judgment on a jury verdict in favor of the other attorney and the law firm. Appellants argue the trial court committed reversible error by denying their pre-trial motion for summary adjudication of negligence, by denying their motion for a directed verdict at trial, by instead directing a verdict in favor of Preston, by failing to properly instruct the jury, and by failing to submit to the jury their prayer for punitive damages. Appellees answer that we may not consider error, if any, from denial of Appellants' motion for interlocutory adjudication on the question of negligence, and that Appellants did not present sufficient evidence to warrant entry of a directed verdict because, at most, they erred in good faith, and in the exercise of their legal judgment, on a matter about which there was no settled view. Appellees also argue that the trial court properly directed a verdict in favor of attorney Preston because he was not involved in preparing the deceased's will and is not vicariously liable for the acts of another attorney in the same firm. Finally, Appellees contend the trial court correctly refused to submit the issue of punitive damages to the jury.

In February 1989, after a stroke left Escal Myers in a wheelchair, his facial muscles partially paralyzed, and his left arm and leg useless, his wife Beatriz [Betty] was appointed guardian of Escal's person and limited guardian of his property. Later that year, Betty and a friend met with Preston and Maxey and asked them to prepare an estate plan for her and Escal, and to handle certain other matters. A primary concern of Escal and the Appellants was avoidance of a will contest by Escal's daughter by his former marriage, Janet Hardiman. Attorneys agreed to represent Escal, and later confirmed their representation by letter to him. Maxey prepared a revocable "living" trust for Escal, and a will with "pour-over" provisions to transfer any of Escal's undisposed assets into the trust when he died. Following Escal's wishes, the new will provided that Hardiman would receive only $5,000 from his estate. The new will and the living trust were signed at Escal's home on December 29, 1989.

At the time Maxey prepared the will, 84 O.S.Supp.1982 § 41(B) provided that:

"[A]ppointment of a guardian or conservator does not prohibit a person from disposing of his estate, real and personal, by

will; provided, that when any person subject to a guardianship or conservatorship shall dispose of such estate by will, *such will must be subscribed and acknowledged in the presence of a judge of the district court.* Subscribing and acknowledging such will before a judge shall not render such will valid if it would otherwise be invalid." [Emphasis added.]

Maxey never recommended to Escal that he sign his new will before a judge, and did not advise him that § 41(B) might have required him to do so. She did, however, recommend by letter to Escal "that the court approve the [living] Trust and reaffirm your ability to determine how you want your property to be distributed upon your death." [1] She acted ostensibly in reliance on her reading of the recently enacted Oklahoma Guardianship Act, 30 O.S.Supp.1988 §§ 1–101 *et seq.* [Guardianship Act],[2] and the court order by which Escal had been made his wife's ward. In the guardianship court's dispositional order, the court had placed Escal under guardianship of his person—which meant he could not vote, serve as a juror, drive a car, or make personal medical decisions—and under limited guardianship of his property. And, as then required by the Guardianship Act,[3] the guardianship court had made a specific finding that Escal possessed and retained "sufficient mental capacity in addition to cooperation with the guardian [Betty] in management of his financial resources and affairs to make a will or execute any other document directing the disposition of [his] property upon [his death]." [4]

Escal died in February 1991, but when his 1989 will was offered for probate, the probate court refused to admit it. From the limited portion of the probate record before us, it appears that the court denied admission of the 1989 will because it had not been subscribed and acknowledged before a district judge in compliance with § 41(B),[5] and despite argument (and testimonial opinion from

Maxey) that, since the guardianship court's dispositional order did not expressly limit Escal's testamentary capacity, he did not have to comply with § 41(B). As a result of the probate court's refusal to admit the will, and also because Escal had not transferred all of his assets to the trust before he died, there remained a substantial estate to pass under the law of intestate succession. The parties here have stipulated that by successfully contesting the will Janet Hardiman received almost $150,000 more from Escal's estate than she would have otherwise received had she been limited to the $5,000 bequest in his 1989 will.

Maxey, a recent law school graduate at the time she prepared Escal's 1989 will, testified that she discussed the requirements of § 41(B) with another lawyer at her law firm:

"A. [By Ms. Maxey] We did not believe it was necessary to have the will signed in front of a judge. The import and emphasis to us was to avoid a probate at all costs, set up a trust, or to transfer the property into joint tenancy. . . . [W]hen I discussed this with [the other lawyer], relying on the guardianship order, we did not feel it was necessary to have this executed in front of a judge.

"Q. [By Ms. Irish] Did it ever occur to you to err on the side of caution and get this will signed in front of a judge?

"A. In my opinion under the new guardianship act there was absolutely no requirement when a court has already determined that the ward had no restriction as to a will." [6]

Yet, Maxey conceded elsewhere in her testimony that there was a valid distinction to be made between *making* a will and *executing* one—between deciding how property should pass after death and signing the document itself—and that statutory restrictions upon

---

1. Rec. 789; Defendant's Exhibit No. 6, p. 3.

2. Now, with amendments in 1990, the "Oklahoma Guardianship and Conservatorship Act."

3. 30 O.S.Supp.1988 § 3–113(C)(4).

4. Defendant's Exhibit No. 15, Order of the District Court of Pontotoc County dated Feb. 27, 1989, pp. 4–5.

5. *See In re Estate of Lahr,* 744 P.2d 1267 (Okla. 1987). In *Estate of Lahr,* the court rejected challenges to § 41(B) based on the federal Equal Protection Clause, U.S. Const., amend. XIV, § 2, and the state constitutional provision defining the separation of powers, Okla. Const., art. IV, § 1.

6. Trial Tr., Vol. II, pp. 137–38.

executing a will would seem to impinge upon the freedom to make a will.

With this factual background, we proceed to consider the parties' arguments for and against reversal. First, we reject the contention that the trial court's ruling on Appellants' motion for interlocutory summary adjudication of the negligence issue is not reviewable on appeal. Appellees cite *Johnson v. Johnson,* 674 P.2d 539 (Okla. 1983), for the proposition that the ruling is not reviewable because it was merged into the trial court's final judgment. But, as we read the opinion, *Johnson* decided only that obligations created by an order *pendente lite* are merged into a final judgment. *Id.,* 674 P.2d at 543. Orders summarily adjudicating legal or factual issues before trial do merge into the trial court's final judgment, but, so long as an alleged error has been preserved, the allegation may be reviewed on appeal. *See, e.g., Tinker Investment & Mortgage Corp. v. City of Midwest City,* 873 P.2d 1029, 1035 n. 19 (Okla.1994) (citing case law under Fed.R.Civ.P. 54(b)—*see* 12 O.S.Supp.1993 § 994—that a summary judgment ruling which is unappealable without certification merges into final judgment and then becomes open to appellate review on appeal after entry of final judgment); *Reams v. Tulsa Cable Television, Inc.,* 604 P.2d 373, 376 (Okla.1979) (interlocutory ruling on agency issue not reviewable until entry of final judgment); *and cf., Harrell v. Old American Ins. Co.,* 829 P.2d 75, 78 (Okla.App.1991), *cert. denied* (denial of summary judgment mooted by subsequent trial in which movant did not object to submission of issues to jury, and adverse party was entitled to directed verdict on liability issues).

Appellants requested summary adjudication in their favor that (a) the law firm was responsible for the acts of its employee-lawyers, (b) the firm breached its implicit promise to deliver a valid will as part of its undertaking to perform estate planning services, (c) Appellants were third-party benefi-ciaries of the contract between the firm and Escal Myers, and (d) failure to have Escal's will subscribed and acknowledged according to § 41(B) constituted negligence. Appellees disputed the negligence theory, raised an issue of contributory negligence, denied there was a specific agreement to prepare a will, and challenged Appellants' standing. The trial court denied the motion saying only that there appeared at least to be a triable factual issue about whether Appellants had failed to follow legal advice from Maxey.[7] On appeal, Appellants assert the trial court erred by refusing to adjudicate liability for breach of contract and negligence in their favor. We have examined the record, and we conclude that the trial court correctly determined that substantial factual controversies existed which precluded summary adjudication.

The trial court granted a directed verdict in favor of Preston at the close of Appellants' evidence after Appellees argued he was merely a co-employee with Maxey at the law firm, and had no role in preparing Escal's will. Appellants contend the ruling was in error because Preston met with Betty Myers on two occasions, and wrote a letter summarizing the firm's undertakings on Escal's behalf. He also discussed the applicability of § 41(B) with Maxey on one occasion, and admitted during his testimony that he did not caution her to have the will subscribed and acknowledged in front of a judge. We agree with Appellees, however, that this evidence was insufficient to render Preston either directly or vicariously liable if preparation of the will fell below the standard of care owed by an attorney to a client. He was not a principal in the law firm (i.e., not a shareholder, director, or officer), and he did not possess or exert any direction or control over the preparation of the will. He did other work for Escal and Betty Myers which is not the subject of Appellants' claim of negligence. We therefore affirm the judgment in favor of Preston.

---

7. In an affidavit accompanying Appellees' response to the motion, Maxey stated, "Had Mr. and Mrs. Myers followed my advice by immediately transferring all of Mr. Myers' assets into the revocable trust it would not have been necessary to offer the will for probate. The will which I prepared for Mr. Myers was nothing more than a precautionary measure in the event Mr. Myers subsequently acquired assets which for some reason or another he failed to transfer to the revocable trust before his death." [Rec. 257, Affidavit of Marissa Maxey, ¶ 23.]

■ Before proceeding to the remaining contentions by Appellants, we pause to discuss what, clearly, is the legal crux of this case: the fundamental disagreement about the proper interpretation of § 41(B) in light of the subsequent enactment of the Guardianship Act. At trial, each side presented expert testimony on this point. For Appellants, Robert Huff, author of the seminal treatise on Oklahoma probate law—*see* R. Huff, *Oklahoma Probate Law and Practice* (2nd ed. 1982) and *id.* (3rd ed. 1995)—testified, "There's no doubt in my mind that it [the will of someone under guardianship] must be executed in front—in the presence of a district judge." [8] For Appellees, Theresa Collett, a member of the legislative task force which drafted the Guardianship Act, opined that the subscription and acknowledgment requirement of § 41(B) did not apply to someone such as Escal Myers, who had been expressly declared by a guardianship dispositional order, made in conformity with the existing Guardianship Act, *see* 30 O.S.Supp. 1989 § 3–113(C)(4),[9] to be able to "make a will or execute any other document directing the disposition of the ward's property upon [his] death ..." Ms. Collett placed particular emphasis on the Guardianship Act's declaration that a person placed under guardianship "shall retain all legal rights and abilities other than those expressly limited or curtailed in [the dispositional or subsequent guardianship] orders," *id.,* § 1–111(21).

The legislative intent *expressed* in the Guardianship Act is set forth in § 3 of the original 1988 enactment:

A. It is the purpose of the Oklahoma Guardianship Act to promote the general welfare of all citizens by establishing a system of general and limited guardianships for minors and for incapacitated and partially incapacitated persons which provides for the protection of their rights and the management of their financial resources.

B. It is the purpose of the system of general and limited guardianships for incapacitated and partially incapacitated persons established by this act to provide for participation of such persons, as fully as possible, in the decisions which affect them. It is the intent of the Oklahoma State Legislature:

1. that the court shall exercise the authority conferred by the Oklahoma Guardianship Act so as to encourage the development of maximum self-reliance and independence of the incapacitated or partially incapacitated person and make appointive and other orders only to the extent necessitated by the mental and adaptive limitations or other condition of the incapacitated or partially incapacitated person warranting the procedure;

2. that in performing their duties and exercising their powers, guardians and limited guardians of incapacitated or partially incapacitated persons shall:

a. assure, to the extent reasonably possible, that the rights of the wards for whom they are appointed are protected;

b. encourage, to the extent reasonably possible, incapacitated or partially incapacitated persons to participate to the maximum extent of their abilities in all decisions which affect them and to act on their own behalf on all matters in which they are able to do so within the limitations imposed by the court; and

c. as appropriate, assist their wards to develop or regain to the maximum extent possible their capacity to meet the essential requirements for their health or safety, or to manage their financial resources or both.

30 O.S.Supp.1988 § 1–103.

■ A lawyer is not expected to be perfect in giving advice to her clients. One who alleges negligence by an attorney must plead and prove the attorney-client relation, a breach of duty arising from the relation, and injury proximately caused by the breach. *Allred v. Rabon,* 572 P.2d 979, 981 (Okla. 1977); *see Erwin v. Frazier,* 786 P.2d 61, 63–64 (Okla.1989); *Ranier v. Stuart & Freida, P.C.,* 887 P.2d 339, 340 (Okla.App.1994); *but*

---

8. Trial Tr., Aug. 29, 1994, p. 28.

9. In 1990, the Legislature amended the Guardianship Act to remove the reference to testamentary capacity in § 3–113(C).

*cf., Great Plains Fed. Sav. & Loan Ass'n v. Dabney,* 846 P.2d 1088 (Okla.1993) (attorney assumed the role of abstractor by agreeing to review title records, and so by inference agreed to furnish correct statement of documents affecting title for purposes of making loan).

In *Collins v. Wanner,* 382 P.2d 105 (Okla. 1963), the Supreme Court of Oklahoma first recognized the "good faith" rule:

> [W]here, as here, negligence is predicated upon the attorney's alleged ignorance of the law, the rule has been followed in many jurisdictions that an attorney is not liable for reaching a conclusion as to a controversial point of law which by subsequent authoritative decision is proved to be erroneous. [citations] In [*Hodges v. Carter,* 239 N.C. 517, 80 S.E.2d 144, 45 A.L.R.2d 1 (1954) ] this was said in the body of the opinion:
>
> > "An attorney who acts in good faith and in an honest belief that his advice and acts are well founded and in the best interest of his client is not answerable for a mere error of judgment or for a mistake in a point of law which has not been settled by the court of last resort in his State and on which reasonable doubt may be entertained by well-informed lawyers. [citations]"
>
> * * * [S]ince the point of law upon which defendants reached an erroneous conclusion was unsettled at the time the conclusion was reached and was one upon which, as reflected by the opinion rendered therein and evidence that defendants caused to be introduced here, qualified and experienced lawyers differed, defendants cannot be said to have been negligent in reaching the conclusion thereon that they reached.

*Collins,* 382 P.2d at 109; *see Hodges,* 80 S.E.2d at 146. *See also Wabaunsee v. Harris,* 610 P.2d 782, 784 (Okla.1980); *Allred,* 572 P.2d at 981.

■ In other jurisdictions it is not enough that an attorney acts under a subjective belief that she is acting in good faith; the attorney's good faith is in those cases measured by an objective standard. *See, e.g., Cosgrove v. Grimes,* 774 S.W.2d 662, 664 (Tex.1989); *Byrd v. Woodruff,* 891 S.W.2d 689, 701 (Tex.Ct.App.1994); *Wartnick v. Moss & Barnett,* 476 N.W.2d 166, 170 (Minn. App.1991), *aff'd in part, rev'd in part on other grounds,* 490 N.W.2d 108 (Minn.1992). An objective approach to the question of good faith seems commendable in our view, lest an attorney's own protestations of good faith insulate him from a charge of negligence. An objective approach to the good faith defense also dovetails nicely with the general standard of reasonableness which is the essential inquiry in a negligence case.

Appellants contend there could be no mere error of judgment or mistake on an unsettled point of law in this instance because the reading of § 41(B) is not a matter upon which reasonable doubt could have been entertained by well-informed lawyers. This position underlies their request for summary adjudication of liability before trial, and their motion for directed verdict at trial. Appellants also advance that argument as the reason why the trial court should at least have given uniform instructions on negligence per se [10] and unknowing violation of statute [11] in its instructions to the jury. Appellees, on the other hand, point out that seemingly well-informed lawyers did in fact express quite different views at trial about how § 41(B) should be read in light of the Guardianship Act. And, obviously, the Supreme Court of Oklahoma has not spoken on this issue yet. Appellees further argue that giving the Appellants' requested instructions would have been the equivalent of directing the jury to find Maxey negligent, and so would have been inconsistent with its prior

**10.** OUJI–Civ.2d, Instruction No. 9.10, reads in part:

> "In addition to the duty to exercise ordinary care there are also duties imposed by [statutes/ordinances]. If you find that a person violated [any one of] the following [statutes/ordinances] and the violation was the direct cause of the injury, then such violation in and

of itself would make such person negligent...."

**11.** OUJI–Civ.2d, Instruction No. 9.12, reads:

> "It is not a defense to an alleged act of negligence that a person was unaware that this conduct constituted a violation of a [statute/ordinance]."

ruling denying Appellants' motion for directed verdict on liability issues.

When a court interprets a statute, it must adhere to the plain and ordinary meaning of the terms employed by the legislature, unless a contrary intent appears from consideration of the statute as a whole. *Medina v. State*, 871 P.2d 1379, 1382 (Okla.1993); *Naylor v. Petuskey*, 834 P.2d 439, 440–41 (Okla. 1992). In this case we are presented one statute which, while recognizing that someone under guardianship is not thereby precluded from making a will, clearly requires that any will made by a person under guardianship must be subscribed and acknowledged before a district judge; and another statute which was enacted so that a ward could, as fully as possible, participate in decisions which affect him, and which provides that a person placed under guardianship is not thereby deprived of his testamentary powers unless specifically limited by dispositional or subsequent court order.

We do not discern any outward inconsistency between § 41(B) and the Guardianship Act. But we are not here to decide an original issue of statutory interpretation. Rather, we consider only a threshold issue: whether either of the two interpretations expressed by the experts in this case is so implausible as to make it unreasonable, as a matter of law, for an attorney to use it as the basis for acting in her client's best interests. In considering that issue we must accept the unquestioned credentials of the two expert witnesses who testified before the jury; and, under the circumstances of this case, the *fact* of their divergent opinions about how these two statutes should be read each with the other. It ultimately does not matter whether we would adopt one or the other interpretation as our own, but only whether a well informed lawyer could reasonably entertain one or the other interpretation in the course of representing her client.

When a motion for directed verdict is made, the trial court must disregard all evidence in favor of the moving party and then determine whether there is any evidentiary or legal inference which would support a judgment for the opposing party. *Woods v. Fruehauf Trailer Corp.*, 765 P.2d 770, 773 (Okla.1988); *Messler v. Simmons Gun Specialties, Inc.*, 687 P.2d 121, 130 (Okla.1984). On review of denial of a motion for directed verdict, we will examine the record and determine whether there is any evidence reasonably tending to support the trial court judgment. *Trett v. Oklahoma Gas & Electric Co.*, 775 P.2d 275, 277 (Okla.1989); *see Sooner Foods, Inc. v. Eggleston*, 412 P.2d 621, 622 syllabus 2 (Okla.1966) (per curiam). Under the circumstances presented in this case, we are constrained to hold that the trial court did not err by denying Appellants' motion for directed verdict.

The "salient test" for error in instructions is set forth in *Missouri–Kansas–Texas R.R. Co. v. Jones*, 354 P.2d 415, 422 (Okla.1960): whether by submission or omission of an instruction, the jurors were probably misled regarding the legal standards they should apply to the evidence. *See also Chimney Rock Ltd. Partnership v. Hongkong Bank of Canada*, 857 P.2d 84, 87 (Okla. App.1993), *cert. denied.* We will not reverse for error in the trial court's jury instructions unless we are persuaded that the error "has probably resulted in a miscarriage of justice, or constitutes a substantial violation of a constitutional or statutory right." 12 O.S. 1991 § 78; 20 O.S.1991 § 3001.1; *see Cimarron Feeders, Inc. v. Tri–County Elec. Coöp., Inc.*, 818 P.2d 901, 902 (Okla.1991). For the reasons set out in the preceding discussion, we hold that the trial court did not err by refusing to give the Appellants' requested instructions on negligence per se and unknowing violation of statute.[12]

In their last assignment of error, Appellants contend that the trial court should have allowed the jury to consider their prayer for punitive damages. We disagree. Even if we accepted Appellants' negligence claim as proved, there is no evidence in the record to suggest that Maxey's conduct "evinc[ed] a wanton or reckless disregard for the rights of another, [or] oppression, fraud or malice" within the scope of the punitive damages statute, 23 O.S.1991 § 9. As shown above, there were legitimate reasons for

---

**12.** Notes 9 and 10, *supra.*

Maxey to let Escal Myers to sign his new will at his home instead of going before a district judge. We hold that the trial court did not err by refusing to submit the question of punitive damages to the jury.

Having considered and rejected each of Appellants' claims of error, we hold that the trial court judgment must be affirmed.

AFFIRMED.

GARRETT, C.J., concurs in result.

JOPLIN, J., concurs.