F I L E D
United States Court of Appeals
Tenth Circuit

NOV 6 2000

PATRICK FISHER
Clerk

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

PATRICIA WHEELER,

      Plaintiff - Appellant,

v.

HO SPORTS INC.; PREMIER SKI
BOAT CORPORATION, doing
business as Waterski America,

      Defendants - Appellees.

No. 99-6039

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA
(DC. No. 98-CV-242-A)**

---

David A. Walls (Joel H. McNatt with him on the briefs) of McKinney & Stringer,
P.C., Oklahoma City, Oklahoma, for Plaintiff-Appellant.

Curtis L. Smith of Chubbuck, Smith & Rhodes, Oklahoma City, Oklahoma, and
Jason E. Roselius of Whitten, McGuire, Terry & Roselius, Oklahoma City,
Oklahoma (John Dexter Marble of Chubbuck, Smith & Rhodes for Premier Ski
Boat Corp. d/b/a Waterski America; Reggie N. Whitten, Douglas A. Terry, and R.
Gregory Kirby of Whitten, McGuire, Terry & Roselius, Oklahoma City,
Oklahoma, for H.O. Sports, Inc., with them on the brief), for Defendants-
Appellees.

---

Before **HENRY**, **McKAY**, and **ANDERSON**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Plaintiff brought a products liability action after her husband drowned in an Oklahoma lake while wearing Defendants' life-vest. The district court granted summary judgment for Defendants, and this appeal followed. We exercise jurisdiction under 28 U.S.C. § 1291.

The product at issue is a vest used in water sports, specifically waterskiing and wakeboarding. The vest was imported, distributed, and sold by Defendants.[1] Plaintiff's husband, Mr. Scott Wheeler, wore the vest while wakeboarding behind a boat driven by a friend. Mr. Wheeler, an advanced wakeboarder, attempted a difficult aerial trick, crashed face-first into the water, and was apparently knocked unconscious upon impact. Having observed the accident, the driver immediately turned the boat around and arrived at the would-be pick-up site within eight to ten seconds. The record is not clear on how long Mr. Wheeler floated at the surface of the water, but he had already sunk when the driver arrived. The driver, a certified life guard, dove into the water and attempted to recover Mr. Wheeler. Approximately two hours later, the Oklahoma City Fire Department located him drowned at the bottom of the lake.

Plaintiff, who witnessed the accident from lakeshore and assisted in the efforts to rescue her husband, brought this action under a strict liability theory alleging that the life vest was unreasonably dangerous. The district court granted

_____

[1]The vests were manufactured for Defendants in Asia.

Defendants' joint motion for summary judgment, ruling that the vest was not unreasonably dangerous and that, in the alternative, Mr. Wheeler assumed the risks associated with using that type of vest.

Our review of the district court's grant of summary judgment is de novo, applying the same legal standard as the district court. See Simms v. Oklahoma ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir.), cert. denied, __ U.S. __ , 120 S. Ct. 53 (1999). Summary judgment is appropriate when a review of the record shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Id. (quoting Fed. R. Civ. P. 56(c)). An issue of material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party to a motion for summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Under the applicable Oklahoma product liability law, a plaintiff suing a retailer or supplier under a strict liability theory must prove (1) that the product caused plaintiff's injury; (2) that the defect existed in the product at the time of sale or at the time it left the retailer's possession and control; and (3) that the defect made the product unreasonably dangerous. See Kirkland v. General

Motors Corp., 521 P.2d 1353, 1363 (Okla. 1974); see also Rohrbaugh v. Celotex Corp., 53 F.3d 1181, 1183 (10th Cir. 1995); Restatement (Second) of Torts § 402A (1965). "The alleged defect may be the result of a problem in the product's design or manufacture, or it may be the result of inadequate warnings regarding use of the product." Holt v. Deere & Co., 24 F.3d 1289, 1292 (10th Cir. 1994); see also Mayberry v. Akron Rubber Mach. Corp., 483 F. Supp. 407, 412 (N.D. Okla. 1979) (applying Oklahoma law); Restatement (Second) of Torts § 402A cmt. h. A product is unreasonably dangerous when it is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics." Kirkland, 521 P.2d at 1362-63 (adopting the standard of proof from the Restatement (Second) of Torts § 402A cmt. g).

In this case, Plaintiff asserts that the vest was defective in manufacture and also that the warning was inadequate. While there is some dispute whether she argued a design defect, we conclude that she has, and we address that argument separately. Plaintiff alleges two theories of manufacturing defect: (1) the thickness of the foam in Mr. Wheeler's vest was only half of that advertised in promotional brochures; and (2) in a test administered by Defendants, five men wearing vests identical to Mr. Wheeler's all floated at the surface of the water. Plaintiff also alleges that the vest was defective because it contained only 7.1

-4-

pounds of foam material and 10 pounds of flotation material is necessary to float an average person at the surface, which is a design defect argument. Finally, Plaintiff alleges that the warning attached to the vest was insufficient to apprise users that the vest would not float them in a manner necessary to prevent drowning. We turn first to the allegations of manufacturing defect.

A product is defective in manufacture if it "deviates in some material way from its design or performance standards. The issue is whether the product was rendered unsafe by an error in the manufacturing process." Jones by Jones v. Lederle Labs., 695 F. Supp. 700, 706 (E.D.N.Y. 1988). Errors in the process are often established by showing that a product, as produced, failed to conform with the manufacturer's specifications. Oja v. Howmedica, Inc., 111 F.3d 782, 792 (10th Cir. 1997) (applying Colorado law) (citation omitted). The question presented for our review is whether Plaintiff's allegations establish a genuine issue of material fact about the manufacture of the vest. We conclude that they do not.

The record contains evidence that Mr. Wheeler's vest contained 3/8-inch foam in contrast to Defendants' promotional brochure, which advertised a vest consisting of 3/4-inch foam. Although we might expect advertised specifications to match production specifications, proving one does not prove the other. Plaintiff has been explicit that this is not a breach of warranty case. See

Appellant's Br. at 20. If it were, we would have reason to rely on the language of the advertisement, but it is not and we cannot. See Osburn v. Bendix Home Sys., Inc., 613 P.2d 445, 448 (Okla. 1980) (distinguishing manufacturing defect claim from breach of an express warranty). Notwithstanding the advertisement, the record does not establish that 3/4-inch foam is a manufacturing baseline standard. Consequently, the record does not support a conclusion that the composition of the vest constituted a departure from usual manufacturing specifications. On the contrary, the record makes evident that other vests have been manufactured identically to the vest worn by Mr. Wheeler, which suggests conformity with standards rather than deviation from them.

Plaintiff asserts that her husband's vest must have been manufactured defectively because he sank. She compares this outcome to the tests administered by Defendants' expert witness, where wearers did not sink. In those tests, males wearing vests identical to Mr. Wheeler's floated at the surface of the water despite their best efforts to sink themselves. To establish a manufacturing defect under Oklahoma law, however, Plaintiff must "offer . . . [a] theory as to the cause of the defect," going beyond a mere "assertive statement that the defect occurred during the manufacturing." Kimbrell, 555 P.2d at 593. Plaintiff has not done so. Although Plaintiff presumes that the fact of her husband's drowning proves the vest to have been defectively manufactured, the Oklahoma Supreme Court has

held that "'the mere happening of an accident raises no presumption' . . . of defectiveness in the article involved in an accident." Kirkland, 521 P.2d at 1363 (quoting Lyons v. Valley View Hosp., 341 P.2d 261 (Okla. 1959)). Plaintiff has not established that a deviation from performance standards occurred nor that an error occurred in the manufacturing process. Having reviewed the record and considered Plaintiff's assertions, we hold that there are no genuine issues of material fact about whether there was a manufacturing defect. Accordingly, we turn to the design defect argument.

A product is defective in design if something about that design "renders it less safe than expected by the ordinary consumer." Lamke v. Futorian Corp., 709 P.2d 684, 686 (Okla. 1985). "[T]he fact that it is possible to make a product more safe does not render its design defective." Walters v. Materials Transp. Co., No. 98-6303, 1999 WL 374246, at *2 (10th Cir. June 4, 1999). Plaintiff asserts that the vest was defective because it contained only 7.1 pounds of floatation material and not the 10 pounds necessary to float an average person. Having reviewed the record, we conclude that Plaintiff's evidence fails to establish that ordinary consumers expect more than 7.1 pounds of floatation material in this type of vest. The record contains the testimony of expert witnesses who appear to agree that an average person requires 10 pounds of floatation material to float in freshwater. Although this testimony establishes that the life vest could have been safer, it

-7-

fails to establish that the design of the product made it unreasonably dangerous for the purposes for which it was designed. It is undisputed that the vest worn by Plaintiff's husband was not an ordinary life jacket. Rather, the vest was designed for use by experienced, skilled wakeboarders, and was often worn in competitions. These wearers, who constitute the ordinary consumers of this vest, are willing to forego some degree of floatation for the sake of enhanced mobility. Plaintiff's assertion that the vest was not designed to function as an ordinary life vest is answered squarely by the fact that the vest was not designed to be an ordinary vest. Because her argument mistakenly assumes that the vest was designed for ordinary purposes, she fails to raise a genuine issue about the adequacy of the vest's design.

Plaintiff's final argument is that Defendants' vest was unreasonably dangerous because the warning failed to apprize users that the vest would not float them in a manner necessary to prevent their drowning. A product is defective as a result of inadequate warning when "it is placed in the hands of the ultimate consumer without adequate warnings of the dangers involved in its use." McKee v. Moore, 648 P.2d 21, 23 (Okla. 1982). A warning is inadequate "particularly where a manufacturer has reason to anticipate danger may result from the use of his product and the product fails to contain adequate warning of such danger." Smith v. United States Gypsum Co., 612 P.2d 251, 253-54 (Okla.

1980).  We recite the complete text of Defendants' warning label as it appears on the vest:

CAUTION:  READ BEFORE USE

THIS PRODUCT IS NOT A COAST GUARD APPROVED LIFE SAVING DEVICE

This product is not approved by the U.S. Coast Guard, the Canadian Coast Guard or any other agency designated to grant such approvals and may therefore not be counted toward fulfillment of your mandatory carriage requirement.  This product does not have any stated or implied warranties concerning its performance.

This product is designed for use by experienced riders only.  It should be used only during conditions where adequate supervision ensures constant monitoring of the wearer and pick-up boats are being used.

The buoyancy distribution is not sufficient to float a person face-up in the water.  This product should not be used by non-swimmers and will not protect any wearers from drowning or injury.

THIS PRODUCT IS NOT A LIFE JACKET

Plaintiff explains that she and her husband had discussed this warning beforehand.  They understood the warning to mean that the vest would not float a person face-up, such that they could continue to breathe even if unconscious, but that it would float a person face-down.  Thus, when properly supervised, a downed wearer could be recovered by those in a pick-up boat.  The district court noted that the label specifically warned of incapacity to float a person face-up in the water, but concluded that the warning "does not imply that it will float

-9-

someone face-down in the water either." Appellant's App., vol. 2, at 385. We respectfully disagree with the district court. We see nothing in the label that warns a wearer that he or she will not float at all, which is a distinctly different risk than the risk of not floating face-up.

The warning uses the language "buoyancy distribution." The implication, if not immediate connotation, of that language is that buoyancy is in fact distributed. Given the surrounding language, a reasonable wearer could understand that the vest has buoyancy distributed such that it will float a person face-down but not face-up. If the vest will not float a person on the surface of the water at all, the warning understates the risk because the issue is not merely buoyancy distribution but buoyancy deprivation. Further, the warning specifies that the vest should be used only when "adequate supervision ensures constant monitoring of the wearer and pick-up boats are being used." Unless that language is superfluous, which construction we are inclined to avoid, the implication is that constant monitoring and the use of a pick-up boat will avail the wearer. If the vest will not float a wearer at all, supervision and pick-up boats are inadequate and rescue divers are necessary.

The district court observed that the vest is not Coast Guard approved, that it will not protect wearers from drowning, and that it is not a life jacket. A jury may agree with the district court that these general statements trump the specific

warnings we have discussed, but that decision is one for the jury to make. Mr. and Mrs. Wheeler's understanding–that the vest would not keep his head above water if knocked unconscious but would distribute buoyancy sufficient to keep him afloat and enable a pick-up to rescue him–is consistent with the language used throughout the warning. A reasonable jury could reach the same understanding and return a verdict in favor of Plaintiff. The warning did not alert Mr. Wheeler that he would not float at all, and sinking poses a distinctly different danger than not floating in a certain manner.

The district court articulated that Mr. Wheeler was an experienced wakeboarder who assumed the risk of drowning. The court identified the doctrine of assumption of risk as an alternative ground for summary judgment. Oklahoma law requires a "voluntary assumption of the risk of a known defect." Kirkland, 521 P.2d at 1366. Because we have concluded that there is a genuine issue of material fact as to whether the warning specified the potential risk–whether a wearer would float face-down or sink–we cannot conclude that Mr. Wheeler voluntarily assumed the risk of a known defect because what he in fact knew about the vest from the warning is precisely at issue.

We conclude that there is a genuine issue of material fact about the adequacy of the warning. We **REVERSE** and **REMAND** for further proceedings consistent with this opinion.