**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 20, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

ACF 2006 CORP.,

     Plaintiff - Appellee,

v.

JOHN M. MERRITT; MERRITT &
ASSOCIATES, P.C.; MERRITT &
ASSOCIATES LAW OFFICES, P.L.L.C.;
CAROLYN MERRITT; GARY L.
BROOKS; ANN BROOKS; QUAIL
CREEK BANK, N.A.; WINDLE
TURLEY; TURLEY LAW FIRM, P.C.;
JAMES E. FRASIER; FRASIER,
FRASIER & HICKMAN, L.L.P.; LEGAL
RESEARCH & MANAGEMENT
SYSTEMS, INC.,

     Defendants.
-------------
SANDIA SAFETY SCIENCES, LLC;
ERNST, INC.; TKS CONSULTING,
INC.; BEAN & ASSOCIATES,

     Intervenors - Appellants.

No. 13-6086
(D.C. No. 5:12-CV-00161-JTM)
(W. D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **BRISCOE,** Chief Judge, **EBEL** and **PHILLIPS**, Circuit Judges.

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

Plaintiff ACF 2006 Corp. (ACF) filed this diversity action seeking an accounting and turnover of the assets of an Oklahoma City law firm to whom ACF had loaned money. A receiver was appointed and he proposed to disburse to ACF a portion of the proceeds of a litigation settlement obtained by the law firm on behalf of one of its clients. Four entities, Bean & Associates, Sandia Safety Sciences, L.L.C, Ernst, Inc., and TKS Consulting, Inc. (collectively the Intervenors), intervened and objected to the proposed disbursement, arguing that they had contributed services in connection with the litigation and were entitled to be paid first from the settlement proceeds. The district court ultimately granted summary judgment in favor of ACF. The Intervenors now appeal from that decision. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the district court's decision.

I

*Factual background*

*a) The financing agreement between ACF and the Law Firm*

Between 2002 and 2009, ACF loaned money to Merritt & Associates, P.C. (the Law Firm), a law firm based in Oklahoma City, Oklahoma, that represented plaintiffs in personal injury, medical malpractice and products liability cases. The Law Firm typically entered into contingent fee arrangements with its clients and advanced various expenses to be repaid from any recoveries. The Law Firm used the loans it obtained from ACF to finance its operations.

2

The loans from ACF to the Law Firm were memorialized by a series of agreements. On October 21, 2002, the Law Firm executed a Master Loan and Security Agreement in favor of ACF. On October 21st of 2005, 2006, 2008 and 2009, the Law Firm and its named partner, John M. Merritt (Mr. Merritt), entered into Amended and Restated Master Loan and Security Agreements with ACF. On two of those dates, October 21, 2002, and October 21, 2006, Mr. Merritt executed personal guaranties in favor of ACF.

Under both the original agreement and the ensuing amended agreements, the Law Firm granted ACF a continuing security interest in various items of collateral, including:

> All accounts, instruments, chattel paper, general intangibles, payment intangibles (all as defined in Article 9 of the [Uniform Commercial] Code), and all similar rights that [the Law Firm] may have of every nature and kind, including specifically and without limitation, all of [the Law Firm's] rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced, and all other rights and interest that [the Law Firm] may have in and with respect to each and every Client Matter.

App. at 220-21. It is undisputed that this security interest covered any and all legal fees owed to the Law Firm, as well as any and all reimbursements owed to the Law Firm for any incurred costs and expenses arising out of any litigation.

ACF initially perfected its security interest in this collateral by filing a UCC financing statement with the Oklahoma County Clerk's office on October 25, 2002. Thereafter, ACF filed various amendments to its UCC financing statement.

3

*b) The Rice litigation*

On March 25, 2010, the Law Firm agreed to represent an individual named Kelli Rice (Rice) as a plaintiff in a wrongful death action arising out of her husband's death. As part of that agreement, Rice and the Law Firm entered into a fee agreement (Fee Agreement) which provided, in pertinent part, as follows:

> THE ATTORNEY'S FEES WILL BE 50% OF THE TOTAL RECOVERY WHETHER BY SETTLEMENT, JUDGMENT OR OTHERWISE. THERE WILL BE NO FEE IF THERE IS NO RECOVERY, UNLESS CLIENT TERMINATES THIS AGREEMENT OR REQUIRES AN APPEAL TO BE FILED. ATTORNEYS SHALL PAY ONE-HALF (½) OF ALL LITIGATION EXPENSES INCURRED IN THE PROSECUTION OF CLIENT'S CLAIMS AND CLIENT SHALL NOT BE RESPONSIBLE TO EVER REPAY TO ATTORNEY [sic] THIS AMOUNT UNDER ANY CIRCUMSTANCE. IN THE EVENT OF A RECOVERY, CLIENT SHALL FROM CLIENT'S SHARE OF ANY RECOVERY, REIMBURSE ATTORNEYS THE REMAINING ONE-HALF (½) OF THE LITIGATION EXPENSES INCURRED BY ATTORNEYS. IN THE EVENT THERE IS NO RECOVERY, THEN CLIENT SHALL NOT BE RESPONSIBLE TO PAY OR REIMBURSE ANY LITIGATION EXPENSES. THE EXPENSES OF LITIGATION DO NOT INCLUDE MEDICAL EXPENSES, LIENS, SUBROGATION CLAIMS, OR ANY AMOUNTS WHICH MAY BE OWED FOR PAST DUE CHILD SUPPORT PAYMENTS, FOR WHICH THE CLIENT IS SOLELY RESPONSIBLE.

Supp. App. at 237.

The Law Firm subsequently filed suit on behalf of Rice. During the course of litigating Rice's case, the Law Firm incurred $315,314.27 in expenses. Approximately $170,000 of those expenses were incurred by the Law Firm in connection with contracts it entered into with the Intervenors for the provision of various services, including court-reporting and complex scientific testing. It is undisputed that the Intervenors had no

4

direct contractual relationship with Rice.

Rice's case was ultimately settled for a gross amount of $700,000. The terms of the settlement agreement provided for Rice to receive a "Defined Payment" in the amount of $200,000. At the time of settlement, $191,460.04 of the litigation expenses incurred by the Law Firm, including the approximately $170,000 owed to Intervenors, remained unpaid.

*c) The demise of the Law Firm and the creation of the New Law Firm*

In June 2011, disciplinary proceedings were filed against Mr. Merritt with the Oklahoma Bar Association. Mr. Merritt was subsequently disbarred in January 2012.

At or about the time of Mr. Merritt's disbarment, a new law firm, named Merritt & Associates Law Offices, P.L.L.C. (the New Law Firm), was formed. Shortly thereafter, the Law Firm ceased operations. The New Law Firm proceeded to operate at the same address, use the same physical assets and phone number, and employ many of the same attorneys, as the Law Firm. The New Law Firm also substituted itself as counsel for the Law Firm's clients in numerous cases, including the Rice case.

Following his disbarment, Mr. Merritt began working for Legal Research & Management Systems (LRMS), an employee leasing company. Like the New Law Firm, LRMS operated at the same address as the Law Firm. Mr. Merritt also, by way of a purported employee leasing arrangement, worked for the New Law Firm as a legal assistant.

5

*d) The Law Firm's default on its loan obligations with ACF*

The Law Firm defaulted on its loan obligations with ACF and, as of February 6, 2012, owed ACF a total of $1,597,175.28 in principal, interest, fees and expenses. Mr. Merritt has refused or failed to honor the personal guaranties he signed with ACF.

*Procedural background*

On February 13, 2012, ACF filed this diversity action against the Law Firm, the New Law Firm, Mr. Merritt, and four other named defendants. The complaint alleged, in pertinent part, that ACF was "entitled to receive all the attorneys' fees and expenses recovered in . . . cases in which the New Law Firm substituted itself for [the Law Firm] as counsel for [the Law Firm's] clients." Supp. App. at 96. The complaint in turn sought, in pertinent part, an accounting and turnover of collateral of the Law Firm and New Law Firm, as well as a money judgment against the Law Firm, the New Law Firm, and Mr. Merritt.[1] Id. at 100-01.

On June 1, 2012, the district court appointed Edward Nazar, an attorney based in Wichita, Kansas, to act as the receiver for the Law Firm and the New Law Firm, and to take exclusive possession, custody and control of all the real and personal property of the Law Firm and the New Law Firm.

On August 31, 2012, the receiver filed a motion for disbursement of settlement proceeds in the Rice litigation (Motion to Disburse). The Motion to Disburse stated that

---

[1] On April 4, 2012, ACF filed an amended complaint that added five named defendants. Neither those defendants, nor the claims asserted against them, are at issue in this appeal.

6

"[t]he Receiver shall receive the [$700,000 in] settlement funds . . . and shall deposit the same in the trust account that the Receiver maintains for the benefit of [the Law Firm]." App. at 136-37. The Motion to Disburse in turn "request[ed] approval by the Court of the payment of the outstanding expenses," including $191,460.04 in "Unpaid Third Party Expenses." Id. at 137.

On September 24, 2012, the Intervenors filed their motion to intervene and objection to the Motion to Disburse. The Intervenors asserted that they were entitled to be reimbursed for approximately $170,000 of the $191,460.04 in unpaid expense claims. The Intervenors did not object to any of the other proposed allocations outlined in the Motion to Disburse. The district court ultimately allowed $200,000 of the settlement proceeds to be disbursed to Rice (i.e., the Defined Payment amount called for in the settlement agreement), but otherwise denied the receiver's Motion to Disburse.

On October 31, 2012, ACF moved for partial summary judgment with respect to (a) its claim for a money judgment against the Law Firm and Mr. Merritt for amounts owed under the loan agreements and personal guaranties, and (b) its claim for a declaratory judgment against the Law Firm and the New Law Firm "that ACF's security interest in the [Law Firm's] accounts receivable continued when those accounts were transferred to the New Law Firm." Dist. Ct. Docket No. 442 at 1-2. That motion was subsequently granted by the district court. Dist. Ct. Docket. No. 490.

On November 26, 2012, counsel for ACF and the Intervenors appeared before the district court for a pretrial conference and agreed that the appropriate procedural

7

mechanism for resolving the dispute over the $191,460.04 allocated by the Receiver to unpaid expenses (the Disputed Funds) would be a motion for summary judgment. On January 4, 2013, ACF filed a motion for partial summary judgment and argued that it was entitled to all of the Disputed Funds. On that same date, the Intervenors filed a brief in support of their objection to the Motion for Disbursement and asked the district court to grant summary judgment in their favor with respect to $170,000 of the Disputed Funds. On January 9, 2013, the Receiver filed a memorandum in support of ACF's motion for partial summary judgment.

On February 7, 2013, the district court issued a memorandum and order granting ACF's motion for partial summary judgment with respect to the Disputed Funds. The district court concluded, in pertinent part, as follows:

> The Fee Agreement between [the Law Firm] and Kelli Rice provides that the attorneys' fees will be fifty percent of the total recovery whether by settlement, judgment, or otherwise. The Fee Agreement provides for the [Law Firm] to receive fifty percent of the recovery and to pay fifty percent of the litigation expenses. It also provides for Rice to receive fifty percent of the recovery and to reimburse [the Law Firm] for fifty percent of the litigation expenses it incurred. The effect of these provisions is that the client, Rice, is to receive half of the net recovery while [the Law Firm] receives the other half, in conformance with Oklahoma law. As such, the source of all the funds to pay the Intervenors would come from fees or other accounts or contract rights in favor of [the Law Firm]. Since ACF has the first priority security interest in all of the disputed funds, it has priority over the Intervenors' unsecured claims.

Id. at 289.

The Intervenors now appeal from the district court's ruling.

8

## II

### *Appellate jurisdiction*

As an initial matter, we must determine whether we have appellate jurisdiction. On May 17, 2013, we issued an order tolling briefing on the merits and directing the parties to file written responses addressing the issue of appellate jurisdiction. In doing so, we expressed concern that the summary judgment order appealed did not resolve all of the claims alleged in ACF's complaint and thus might not be a final appealable order. See 28 U.S.C. § 1291 ("The courts of appeals . . . shall have jurisdiction of appeals from all final decisions of the district courts of the United States").

ACF's response brief alleviates our concerns. ACF alleges, and a review of the district court's electronic docket sheet confirms, that on February 19, 2013, the district court issued an order "dispos[ing] of all remaining causes of action in the case." ACF Response at 1; see id. at 4 (chart summarizing disposition of each cause of action). As a result, the order challenged by Intervenors in this appeal has now merged into the final judgment and has become final and appealable. See Montgomery v. City of Ardmore, 365 F.3d 926, 934 (10th Cir. 2004); Bowdry v. United Airlines, Inc., 58 F.3d 1483, 1489 (10th Cir. 1995). Consequently, we may "proceed to the merits of [the] appeal." Montgomery, 365 F.3d at 934.

### *Standard of review*

We review a grant of summary judgment de novo, applying the same standard as the district court. Braswell v. Cincinnati Inc., 731 F.3d 1081, 1085 (10th Cir. 2013).

"Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Squires v. Breckenridge Outdoor Educ. Ctr., 715 F.3d 867, 872 (10th Cir. 2013) (quoting Fed. R. Civ. P. 56(a)).

In a diversity case such as this, the laws of the forum state, here Oklahoma, govern our analysis of the underlying claims. Reid v. Geico Gen. Ins. Co., 499 F.3d 1163, 1167 (10th Cir. 2007).

*Are the Disputed Funds owed to the Law Firm?*

We begin our analysis, as did the district court, with the language of the Fee Agreement between the Law Firm and Rice. Under the Fee Agreement, a settlement or judgment on behalf of Rice triggered a duty on the part of Rice to: (a) pay the Law Firm an amount of attorneys' fees equal to "50% of the total recovery"; and (b) reimburse the Law Firm, from Rice's share of the recovery, "one-half (½) of the litigation expenses incurred by" the Law Firm in connection with the case.[2] The Fee Agreement also

---

[2] The dissent concludes, sua sponte, that the Fee Agreement's use of the term "reimburse" means that Rice was obligated to repay the Law Firm only for those litigation expenses that the Law Firm had actually paid. Setting aside the fact that the Intervenors have never argued in favor of such an interpretation, we believe this interpretation is simply wrong. The term "reimburse" means "[t]o repay, recompense (a person to whom one is indebted . . . )." Oxford English Dictionary (3d ed. 2009); see Black's Law Dictionary (9th ed. 2009) (defining "reimbursement" as "[r]epayment"). In this case, the Fee Agreement expressly defined the scope of Rice's "reimbursement" obligation — in other words, the amount of her indebtedness to the Law Firm for litigation expenses — in the event of a recovery: "CLIENT SHALL FROM CLIENT'S SHARE OF ANY RECOVERY, REIMBURSE ATTORNEYS THE REMAINING ONE-HALF (½) OF THE LITIGATION EXPENSES INCURRED BY ATTORNEYS." Supp. App. at 237 (emphasis added). Quite clearly, the Fee Agreement's use of the phrase "expenses incurred" belies any notion that Rice's reimbursement obligation was limited to only those litigation expenses that had actually been paid by the Law Firm. See

provided that the Law Firm would pay one-half of the litigation expenses. Thus, in light

of the $700,000.00 settlement recovery that was achieved in the Rice case, the Fee

Agreement obligated Rice to pay the Law Firm (a) $350,000.00 in attorneys' fees (an

amount equal to 50% of the total recovery), and (b) $157,657.13 to reimburse the Law

Firm for one-half of the litigation expenses incurred by the Law Firm. That would have

left Rice with a net recovery of approximately $192,342.87, and the Law Firm with the

identical amount in net attorneys' fees ($350,000 in fees minus its share of the total

litigation expenses). The caveat, however, is that the terms of the settlement agreement

---

Black's Law Dictionary (9th ed. 2009) (defining "incur" as "[t]o suffer or bring on oneself (a liability or expense)"). And, in any event, we find it difficult to believe that the parties to the Fee Agreement would have intended the interpretation suggested by the dissent, i.e., limiting Rice's reimbursement obligation to the expenses actually paid by the Law Firm. In our view, the only reasonable interpretation of this portion of the Fee Agreement is that, in the event of a recovery, the Law Firm and Rice would share equally in all of the expenses incurred by the Law Firm in connection with the litigation.

We acknowledge, as the dissent points out, that the Fee Agreement uses both the terms "reimburse" and "pay," and thus presumably intends for each of these terms to carry a separate meaning. See Supp. App. at 237 ("IN THE EVENT THERE IS NO RECOVERY, THEN CLIENT SHALL NOT BE RESPONSIBLE TO PAY OR REIMBURSE ANY LITIGATION EXPENSES."). That does not, however, alter our interpretation of the Fee Agreement. In our view, the term "pay," as used in the Fee Agreement, was intended to refer to paying a vendor directly for the litigation services provided. And, as we have explained, the term "reimburse" was intended to refer to Rice paying the Law Firm for her share of the incurred expenses.

The dissent also implies, relatedly, that the Fee Agreement may have obligated the Law Firm "to pay all the litigation expenses as it incurred them." Dissent at 4 n.4. In our view, however, nothing in the Fee Agreement speaks to the matter of when the Law Firm was obligated to pay the incurred litigation expenses. And understandably so. As the record in this case establishes, the litigation expenses, including those relating to the services provided by the Intervenors, were incurred solely by the Law Firm, and, as we have explained, the Fee Agreement obligated Rice to reimburse the Law Firm for half of all the incurred expenses in the event of a recovery. Consequently, the matter of when the Law Firm actually paid the incurred expenses was irrelevant.

11

apparently provided that Rice would achieve a net recovery (or defined payment) of $200,000.00, meaning that the Law Firm would effectively earn slightly less, i.e., $184,685.73, in net attorneys' fees than was otherwise provided for in the Fee Agreement.

The allocation of the $700,000 settlement amount can thus, taking into account both the terms of the Fee Agreement and the settlement agreement, be broken down as follows:

Total Recovery: **$700,000.00**

Law Firm's Gross Fees: $342,342.87
Law Firm's Share of Expenses: $157,657.14
Law Firm's Net Fees: **$184,685.73**

Rice's Gross Recovery: $357,657.13
Rice's Share of Expenses: $157,657.13
Rice's Net Recovery: **$200,000.00**

In turn, the receiver is obligated to allocate the $700,000.00 between the Law Firm and Rice in the following manner:

Law Firm:
- Gross Fees $342,342.87
- Expense reimbursement from Rice $157,657.13
   Total allocation **$500,000.00**[3]

Client:
- Net Recovery (and Total allocation) **$200,000.00**

---

[3] This total allocation, minus the total expenses incurred by the Law Firm ($315,314.27), equals the Law Firm's Net Fees ($184,685.73).

12

*The scope of ACF's Article 9 security interest*

The next question is whether, as the district court concluded, ACF's security interest extends to that portion of the settlement funds that the receiver is obligated to allocate to the Law Firm. As we have noted, the Law Firm expressly granted, by way of the Master Loan and Security Agreement and subsequent amendments, a continuing security interest in "[a]ll accounts . . . and all similar rights that [the Law Firm] may have of every nature and kind, including specifically and without limitation, all of [the Law Firm's] rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced." It is undisputed that this security interest covered any and all legal fees and cost reimbursements due to the Law Firm from a client. It is also undisputed that ACF perfected its security interest by filing a UCC financing statement with the Oklahoma County Clerk's office (and by continuing to amend that financing statement). See Okla. Stat. tit. 12, §§ 1-9-201 (general effectiveness of security agreement), 1-9-308 (when security interest is perfected), 1-9-312 (perfection of security interests in deposit accounts and money) (2013).

As a result of the above-described allocation of the Rice settlement funds, the entire $500,000.00 allocated to the Law Firm must be treated as the Law Firm's property, specifically as an "account" or "right to receive payment" under the terms of ACF's security interest. And, because ACF has a perfected security interest in such property, and because the Law Firm is indebted to ACF in the amount of $1,597,175.28, ACF is

legally entitled to the $500,000 due from the receiver to the Law Firm. To the extent that the Intervenors have a security interest in the same funds, there is no evidence that such interest has been perfected. As a consequence, the Intervenors' claim to any of the remaining $500,000 in settlement funds is subordinate to ACF's perfected security interest. See Okla. Stat. tit. 12, § 1-9-322(a)(2) (providing that "[a] perfected security interest . . . has priority over a conflicting unperfected security interest").

*Is the Fee Agreement contrary to Oklahoma law?*

The Intervenors argue on appeal, however, that the Fee Agreement is contrary to Oklahoma law because it requires the amount of the Law Firm's attorneys' fees to be calculated based on the gross amount of the settlement recovery, rather than on the net amount of the recovery (i.e., the gross amount of the recovery minus all litigation expenses). Consequently, Intervenors argue, the Law Firm has, contrary to Oklahoma law, "derived the benefit of 75% of the Rice settlement funds." Aplt. Br. at 14.

In support, the Intervenors point to Title 5, Section 7 of the Oklahoma statutes, entitled "Contingent fee–Limitation on amount–Compromise or settlement–Effect on lien–Certain contracts void," which provides, in pertinent part, as follows:

> It shall be lawful for an attorney to contract for a percentage or portion of the proceeds of a client's cause of action or claim not to exceed fifty percent (50%) of the net amount of such judgment as may be recovered, or such compromise as may be made, whether the same arises ex contractu or ex delicto, and no compromise or settlement entered into by a client without such attorney's consent shall affect or abrogate the lien provided for in this chapter.

Okla. Stat. tit. 5, § 7 (2013).

14

We conclude that the Fee Agreement, although not a model of clarity, is ultimately consistent with this statutory limitation. To be sure, the Fee Agreement provides, in part, that the attorneys' fees "will be 50% of the total recovery." But the Fee Agreement also goes on to provide that the Law Firm must pay one-half of all litigation expenses and will, under no circumstances, be reimbursed by the client for that share of the expenses. The end result is, as we demonstrated above, that the Law Firm's fee award in any instance is precisely 50% of the net amount of the recovery (unless, as occurred in this case, the terms of a settlement agreement effectively lowers the amount of the Law Firm's fees). See Okla. Bar Ass'n Ethics Advisory Opinion No. 26 (1932) (opining "that the proper construction of" Okla. Stat. tit. 5, § 7 "would be that the fifty percent maximum should operate upon the amount of the actual net recovery by the client, to-wit, the amount of the judgment less the costs incurred or expended in obtaining it.").

Intervenors also argue, relatedly, that "the effect" of the district court's "deduction of the expenses from the settlement without requiring the actual payment of the expenses" resulted "in an unlawful windfall to [the Law Firm] (and, ultimately, ACF)." Aplt. Br. at 18. "Essentially," Intervenors argue, "the client recovery was computed with the full amount of the expenses taken into consideration, while the Receiver suggested, and the [district] court agreed, that [the Law firm] should not be responsible for any of the expenses." Id. at 19.

Contrary to the Intervenors' arguments, however, the district court's order did not eliminate entirely the Law Firm's responsibility to pay the Intervenors. Rather, the

15

district court's order simply and correctly calculated the allocation of the settlement amount between the Law Firm and Rice in accordance with the terms of their Fee Agreement and the modifying terms of the settlement agreement. The question of whether Intervenors would be paid from the settlement proceeds, however, was a separate issue of law that the district court correctly resolved in accordance with Article 9 of the UCC as adopted under Oklahoma law. To be sure, the resolution of this latter issue resulted in ACF's entitlement to all of the remaining settlement proceeds. But, as far as we can determine from the record, the Law Firm remains indebted to the Intervenors for the unpaid expenses.

*Equitable/contractual liens and constructive trust*

Intervenors next assert that a contractual lien was created in their favor because the Law Firm "entered into an agreement with the Intervenors under the terms of which the firm promised to satisfy the unpaid bills from the proceeds of any settlement or judgment obtained in the Rice litigation, in exchange for the promise of each Intervenor to continue their assistance and participation in the case." Aplt. Br. at 20. While it is true that Oklahoma law recognizes that liens may be created by contract, see Amarex, Inc. v. El Paso Natural Gas Co., 772 P.2d 905, 907 (Okla. 1987), the Intervenors have failed to include in the record a copy of the purported written agreement between themselves and the Law Firm. Thus, it is impossible for us to confirm whether or not there is a contractual basis for imposing a lien on the Rice settlement proceeds in favor of the Intervenors. And, indeed, Intervenors concede in their opening brief that "the [purported]

16

agreement did not use the specific term 'lien.'" Aplt. Br. at 21.

In any event, even assuming that a written agreement exists and that, under Oklahoma law, it created a contractual or equitable lien in favor of Intervenors upon some of the Rice settlement proceeds, there is no evidence that the Intervenors ever perfected a security interest in those proceeds. Thus, although Intervenors argue in their opening brief that they are "secured creditors in the[se] proceedings . . . and . . . in parity with . . . ACF," id. at 22, there is nothing in the record that would allow us to reach such a conclusion. As a result, Intervenors have failed to establish that their interest in the settlement funds is superior to that of ACF.

Lastly, Intervenors argue that they were "also beneficiaries of a constructive trust relative to the same, discreetly defined fund." Id. at 23. In support, Intervenors argue that a fiduciary relationship "likely existed" between themselves and the Law Firm because the Law Firm "clearly occupied a position . . . in which special trust and confidence had been reposed — the relationship of the parties being such that the Intervenors were essentially at the mercy of the [Law Firm] to do the right thing with those funds that might ultimately be recovered in the case." Id. at 24.

Intervenors have clearly failed, however, to establish the existence of a constructive trust. Under Oklahoma law, "'[c]onstructive trusts' are such as are raised by equity in respect of property which has been acquired by fraud, or where, though acquired without fraud, it is against equity that it should be retained by him who holds it." Morris v. Leverett, 434 P.2d 912, 913 Syllabus ¶ 1 (Okla. 1967). In this case, there has been no

17

allegation of fraud on the part of the Law Firm and, in any event, it is the receiver, rather than the Law Firm, who held the Rice settlement funds prior to the district court's order of summary judgment. Nor is it "against equity" for ACF's perfected security interest in the Law Firm's accounts and receivables to take priority over the Intervenors' unperfected interests in that same collateral. More specifically, the Law Firm has not received "an extraordinary, unlawful attorneys' fee," Aplt. Br. at 26, and it is, for the reasons we have outlined above, apparent that ACF, rather than Intervenors, has "the better right" to the funds at issue, Morris, 434 P.2d at 913 Syllabus ¶ 2. Lastly, although Intervenors refer to a potential fiduciary relationship between themselves and the Law Firm, nothing in the record supports the existence of such a relationship. Rather, as noted by ACF, "Intervenors have alleged nothing more than that they provided services to [the Law Firm] in connection with the Rice Case, that [the Law Firm] agreed to pay for those services and that [the Law Firm] has not paid for those services." Aplee. Br. at 33.

> *Did the Intervenors possess a right to settlement funds that*
> *was beyond the reach of the Receiver?*

In their final proposition of error, Intervenors argue that, in light of the promises of payment made to them by the Law Firm in exchange for the completion of their work on the Rice case, the Law Firm "was merely a conduit through which [their] money was transmitted, and that portion of the settlement proceeds which equals their unpaid bills was no more owned by the [Law Firm] than money shipped on FedEx is owned by FedEx while riding on its plane." Aplt. Br. at 27. In other words, Intervenors argue, "[i]t is-and-

18

always-has-been [their] separate property, and, as such, has been beyond the reach of the receivership *ab initio*." Id. (italics in original).

Not surprisingly, Intervenors fail to point to a single case or statute in support of their arguments. Further, nothing in the record supports their conclusions either. In particular, there is no basis in the record that would allow us to conclude that the Intervenors had a specific right in any of the settlement proceeds in the Rice case. Thus, in turn, there is no basis for concluding that any portion of those proceeds was beyond the reach of the Receiver.

III

The judgment of the district court is AFFIRMED. Both appellees' motion and appellees' amended motion for leave to supplement appellees' supplemental appendix are GRANTED.

Entered for the Court

Mary Beck Briscoe
Chief Judge

19

No. 13-6086, *ACF 2006 Corp. v. Merritt, et al.*

**PHILLIPS,** Circuit Judge, dissenting

I respectfully dissent.

ACF's security interest is limited by two things: (1) the terms of the security agreement; and (2) the Law Firm's rights to the collateral. For two reasons, I would reverse the grant of summary judgment, which found that ACF's security interest reached the Disputed Funds.[1] First, the terms of the security agreement do not reach the Disputed Funds. Second, because the Law Firm had no right to keep the Disputed Funds, neither can ACF.

I.  The Terms of the Security Agreement

The majority treats the Disputed Funds "as an 'account' or 'right to receive payment' under the terms of ACF's security interest." *Supra* at 13. I don't see how either applies to the Disputed Funds.

---

[1] I agree with the majority that $191,460.04 of the settlement total is in dispute. *See supra* at 8. No one disputes that of the $700,000 total, $200,000 goes to Rice in accordance with the settlement agreement. Also, it is undisputed that ACF's security interest reaches the Law Firm's net fees of $184,685.73 and the Law Firm's reimbursement for the $123,854.23 of expenses it paid before the settlement:

| | |
|---|---|
| **Total Recovery** | $700,000.00 |
| Rice's Net Recovery | - $200,000.00 |
| Law Firm's Net Fees | - $184,685.73 |
| Law Firm's Reimbursement for Expenses Paid | - $123,854.23 |
| ***Disputed Funds*** | $191,460.04 |

1

*An Account*. Under the security agreement, ACF has a continuing security interest in "[a]ll accounts . . . that the [Law Firm] may have . . . ." App. at 220–21. Oklahoma's version of the UCC defines "account" as "a right to payment of a monetary obligation, whether or not earned by performance: (ii) for services rendered or to be rendered." Okla. Stat. Ann. 1-9-102(a)(2)(A)(ii). I agree that contracts for legal fees, including fees in pending contingency fee cases, are "accounts" under Article 9. Unquestionably, the Law Firm has a right to payment for legal services it rendered—and ACF, in turn, has a security interest in those fees. But, here, the dispute is not about legal fees, it's about money forwarded to the Law Firm to pay as-yet unpaid litigation expenses. Obtaining money to pay third parties for *their* services doesn't give the Law Firm a "right to payment" for services *it* rendered, so the Disputed Funds don't qualify as an "account."

*A Right to Receive Payment*. Under the security agreement, ACF has a continuing security interest in "all of the [Law Firm's] rights to receive payment or otherwise, for legal and other services rendered and to be rendered, and for costs and expenses advanced and to be advanced . . . ." App. at 220–21. As the majority notes, "It is undisputed that this security interest covered . . . any and all reimbursements owed to the Law Firm for any incurred costs and expenses arising out of any litigation." *Supra* at 3. But, here, there are no *reimbursements* owed on the Disputed Funds because the Law Firm never paid that portion of the expenses. Moreover, under the security agreement's actual language, ACF did not "advance" the Disputed Funds. To "advance" means to pay

2

in anticipation of future reimbursement.[2] The Law Firm couldn't "advance" the litigation expenses without paying them. Continuing on with the security agreement's language, I am uncertain what a security interest in expenses "to be advanced" even means. Whatever its meaning, the facts of this case don't support its application against the Disputed Funds.

## II. The Law Firm's Rights

For a creditor to have a valid security interest under Article 9, the debtor must have rights in the collateral. 12A Okla. Stat. Ann. § 1-9-203(b)(2). "[T]he baseline rule is that a security interest attaches only to whatever rights a debtor may have, broad or limited as those rights may be." U.C.C. § 9-203 cmt. 6 (2000).[3] For the reasons provided below, I believe that ACF does not have rights to the Disputed Funds.

*Oklahoma Law*. The Law Firm's rights cannot extend beyond the limits of Oklahoma law. Under 5 Okla. Stat. Ann. § 7, the Law Firm's fees could not lawfully exceed fifty percent of the net settlement. If the Law Firm had kept the Disputed Funds as collected fees, it would have violated that statute. Similarly, even if the Law Firm somehow had a right to reimbursement for what it hadn't paid, and could simply keep all the expense money to spend as it pleased, that money would become the income (and

---

[2] OXFORD ENGLISH DICTIONARY (3d ed. 2011) ("advance, *v*." means, *inter alia*, "7.b. To pay (a sum of money) before it is due, or in anticipation of work still to be done; to pay or lend on security of future reimbursement").

[3] In addition, ACF's counsel conceded at oral argument that ACF's rights to the money can be no larger than what the Law Firm's would have been.

3

collected fees) of the Law Firm. The contingent debt to the Intervenors wouldn't cancel out the money (or the interest on that money) in the Law Firm's pocket. For this reason, I don't see how the Law Firm could keep the Disputed Funds without violating 5 Okla. Stat. Ann. § 7. Because the Law Firm does not have a right to keep the money, and ACF's rights only extend as far as those of the Law Firm, ACF does not have a right to keep the money.

*The Fee Agreement*. The Law Firm's rights are set forth in the contingent fee agreement. As the majority notes, the fee agreement is not a model of clarity. *See supra* at 15. In construing the agreement, we should remember that the Law Firm drafted it and thus should not benefit from its sloppy draftsmanship. Its rights should shrink, not grow, with each inconsistency and ambiguity.

The fee agreement split the litigation expenses into two halves. In imprecise language, the Law Firm promised to pay the first half and emphasized that Mrs. Rice "shall not be responsible to ever repay to Attorney this amount under any circumstance." Supp. App. at 237. It required Mrs. Rice to "reimburse" the second half in the event of a recovery.[4] *Id.*

---

[4] Although this language guaranteed that Mrs. Rice would never be responsible for this half of the expenses, I don't believe it meant that the Law Firm was not responsible to pay all the litigation expenses as it incurred them. The fee agreement also said that if there was no recovery, Mrs. Rice "shall not be responsible to pay or reimburse any litigation expenses." Someone had to pay the expenses—if not Mrs. Rice, then the Law Firm.

4

"Reimburse" (the Law Firm's word) means the expenses are to be *re*paid.[5] By requiring Mrs. Rice to "reimburse" the Law Firm for her half of the expenses upon a recovery, the fee agreement reasonably reads as requiring the Law Firm to pay all of the expenses incurred before the recovery. Acting accordingly, until its problems overwhelmed it, the Law Firm did pay expenses incurred—$123,854.23 of the $315,314.27 total. Thus, the Law Firm paid all but $33,802.91 of its half of the expenses before settlement, leaving Mrs. Rice's half of the total expenses ($157,657.13) unpaid.

Because one cannot "*reimburse*" something that has not been "*imbursed*," Mrs. Rice had no duty to "reimburse" the Law Firm for expenses it left unpaid. To conclude otherwise would require contorting "reimburse" to mean "pay," which we should not do. The fee agreement itself distinguishes between paying and reimbursing—"In the event there is no recovery, then client shall not be responsible to *pay or reimburse* any litigation expenses." Supp. App. at 237 (emphasis added). Because Mrs. Rice had no duty to "reimburse" the Law Firm her half of the expenses until it paid them, the Law Firm had no corresponding right to keep her $157,657.13 share of the Disputed Funds.[6]

---

[5] BLACK'S LAW DICTIONARY 1399 (9th ed. 2009).

[6] In response to footnote 2 of the majority opinion, I assert that the meaning of "reimburse" remains the same even if followed by "litigation expenses incurred by attorneys." The first definition of "reimburse" from the majority's cited source is "1.a. To repay (a sum of money which has been spent or lost)." OXFORD ENGLISH DICTIONARY (3rd ed. 2009). So to be "reimbursed," by my reading, the Law Firm must first have *spent* money—that is, paid the expenses. "Litigation expenses incurred by attorneys" simply sets the total that is to be divided in half—it doesn't authorize the Law Firm to reimbursement for what it hasn't paid. By limiting Mrs. Rice's reimbursement duty to "litigation expenses incurred by attorneys," the fee agreement says only that Mrs. Rice

*Mere Possession.* Rather than *reimbursing* the Law Firm for her share of the expenses, Mrs. Rice was left to pay her share of the expenses, which I surmise she did voluntarily through the settlement agreement.[7] For administrative ease, most likely, she provided her half of the litigation expenses to the Law Firm (or Receiver) for it to pay those persons or entities owed litigation expenses. It appears that she chose this route rather than going to the trouble of tracking down the expenses, calculating what the Law Firm had already paid for expenses, and issuing her own payment checks. In essence, Mrs. Rice allowed the Law Firm to *possess* the money to pay the expenses. Similarly, the unpaid $33,802.91 of the Law Firm's half of the expenses before settlement are, at most, merely possessed by the Law Firm to pay the balance of the expenses.

As I understand it, the district court assumed that the security interest attached upon the Law Firm's mere possession of the Disputed Funds, not requiring that the Law Firm have a right to keep the money. It simply found that ACF's security interest reached the money because "the source of all the funds to pay the Intervenors would come from fees or other accounts or contract rights in favor of [the Law Firm]." *ACF 2006 Corp. v. Merritt*, 2013 WL 466603 *5 (W.D. Okla. Feb. 7, 2013).

---

has no duty to reimburse a share of anything except "litigation expenses incurred by attorneys"—for instance, non-litigation expenses, or litigation expenses not incurred by the attorneys. As we're forced to tussle over the fee agreement's language, it bears repeating that the Law Firm drafted this language and that we should resolve its ambiguities against it. And, finally, although no party stressed the meaning of "reimbursement" in its brief, I did question counsel about it at oral argument, and counsel had a full opportunity to speak to the issue.

[7] The parties did not include the settlement agreement in the record on appeal.

6

Similarly, the majority opinion finds that "[i]t is undisputed that [ACF's] security interest covered any and all legal fees and cost reimbursements due to the Law Firm from a client." *Supra* at 13. Then it concludes that "the entire $500,000 allocated to the Law Firm must be treated as the Law Firm's property, specifically as an 'account' or 'right to receive payment' under the terms of ACF's security interest." *Id*. In my view, this too equates mere possession of property with a more substantial interest.

Here, even though the Law Firm (through the Receiver) possessed the Disputed Funds, it did not have a right to keep them. *See In re Howell Enterprises, Inc*., 934 F.2d 969, 972 (8th Cir. 1991) ("[M]ere possession of [a letter of credit] is insufficient to establish a right to collateral upon which to base a security interest"); *Pontchartrain State Bank v. Poulson*, 684 F.2d 704, 707 (10th Cir. 1982) ("[M]ere possession of goods or the unexercised option to buy goods is not a sufficient right to grant a security interest in the goods"). At most, the Law Firm was serving as a mere conduit of the funds. *See In re Howell Enterprises, Inc*., 934 F.2d at 972 (security interest did not attach where debtor was involved in transaction for the limited purpose of serving as a conduit for funds).

For the reasons discussed, the Law Firm did not have a right to keep the funds: (1) the contingency fee agreement only gave the Law Firm the right to ownership of settlement funds for litigation expenses it had already paid; and (2) if the Law Firm could own the funds meant for unpaid legal expenses by treating them as Law Firm property (fees), the fee agreement would have violated 5 Okla. Stat. Ann. § 7. However broadly written, the security interest cannot exceed the Law Firm's rights to the collateral. And,

7

after the settlement agreement, the Law Firm merely had a "right" (or duty, really) to possess the money to pay the expenses.

For these reasons, I would reverse the district court's grant of summary judgment in favor of ACF and direct that ACF's perfected security interest does not extend to the Disputed Funds. The district court could then have decided who among the unsecured creditors, including ACF, should receive what amount.